IN THE MATTER OF THE APPEAL OF: NORTH CAROLINA FORESTRY
FOUNDATION, INC., FROM THE ASSESSMENT OF ITS PROPERTY
KNOWN AS THE "HOFMANN FOREST" FOR AD VALOREM TAXATION
BY ONSLOW COUNTY FOR 1974 AND 1975 AND JONES COUNTY FOR
1975

Nos. 34 and 35

(Filed 4 January 1979)

1. **Taxation § 22— ad valorem taxes—nonprofit corporation—educational, scientific, charitable purposes—exclusive use—lease of timberland to business**

Forest land owned by a nonprofit corporation was not used "exclusively" for an exempted purpose within the meaning of G.S. 105-275(12), G.S. 105-278.4, or G.S. 105-278.6, and thus was not exempted from ad valorem taxation by those statutes, where the forest land has been leased to a paper company and has been primarily used by the paper company since 1951 as commercial property, and where the use of the forest land as an educational and scientific resource is incidental to the activities of the paper company thereon.

2. **Taxation § 22— ad valorem taxes—nonprofit corporation—protected natural area**

Property was not held by a nonprofit corporation as a "protected natural area" within the meaning of G.S. 105-275 because of an extensive program of road building, construction of drainage ditches and fire lanes, site preparation, including disking and burning, leasing of hunting rights to local hunting clubs, and the cutting of timber and pulpwood.

3. **Taxation § 22— ad valorem taxes—nonprofit corporation—rescue squads**

All nonprofit organizations do not come within the provision of G.S. 105-278.6(a)(7) exempting from taxation certain property owned by a "nonprofit, life-saving, first aid, or rescue squad organization," since it is apparent that "nonprofit" is limited to "life-saving, first aid, or rescue squad organizations."

4. **Taxation § 21— ad valorem taxes—forest land—ownership not in U.N.C.**

The "Hofmann Forest" is not exempt from ad valorem taxation under G.S. 116-16 as property owned by the University of North Carolina since the record discloses that the property is owned solely by the North Carolina Forestry Foundation, Inc., a nonprofit corporation.

5. **Taxation § 25.3— ad valorem taxes—discovered property—absence of notice to taxpayer**

Where, from 1969 to 1973, a foundation made payments of 10 cents per acre for its timberland, pursuant to G.S. 105-279, in lieu of "county taxes otherwise assessed," and the option of making payments in lieu of taxes was not available after 1973, failure of the county tax supervisor to give the foundation notice of the discovery and listing of the property as required by G.S. 105-312 (d) was not fatal to the 1974 tax assessment on the property since the purpose of the notice requirement is to inform the taxpayer that his property is subject to ad valorem taxation; the foundation should have known its property was in-

In re Forestry Foundation

cluded in the tax base; the foundation was chargeable with knowledge that the option of making payments in lieu of taxes was not available in 1974; and the foundation thus should have known that its property was subject to ad valorem taxation. Furthermore, although failure of the tax supervisor to give the foundation timely notice delayed its opportunity for a hearing on the matter, this omission did not amount to a denial of due process where the foundation did have a full *de novo* hearing before the Property Tax Commission.

**6. Taxation.§ 38— ad valorem taxes—presumption of correctness**

Ad valorem tax assessments are presumed to be correct, and the burden of proof is on the taxpayer to rebut this presumption by producing competent, material and substantial evidence that the county tax supervisor used an arbitrary or illegal method of valuation and that the assessment substantially exceeds the true value in money of the property.

**7. Taxation § 25.4— ad valorem taxes—division of land into classifications**

A foundation failed to present material and substantial evidence that tax appraisers acted arbitrarily or illegally in dividing its land into four classifications based on soil type, location, and ability of the land to produce and in assigning a different value to each classification for ad valorem taxes.

Justice BROCK took no part in the consideration or decision of this case.

ON petitions for discretionary review of the decisions of the Court of Appeals (reported in 35 N.C. App. 414 (1978) and 35 N.C. App. 430 (1978)) which affirmed the judgments in favor of respondents entered by *Herring, J.,* at the 25 October 1976 Session of WAKE Superior Court.

Petitioner, North Carolina Forestry Foundation, Inc., (hereinafter referred to as Foundation) is a nonprofit corporation which was organized under the laws of North Carolina to promote the development and practice of improved forestry methods and to promote the production and preservation of growing timber for experimental, demonstration, educational, park and protection purposes. Another purpose of the Foundation is "to aid and promote by financial assistance and otherwise all types of forest education and research at, or by, the Division of Forestry of North Carolina State University . . . ."

In 1934, the Foundation acquired approximately 81,867 acres of land known as the Hofmann Forest. Approximately 49,455 acres of this tract are located in Onslow County and approximately 31,648 acres are located in Jones County. Also in 1934, the Attorney General of North Carolina expressed his opinion that the Hofmann Forest property was exempt from ad valorem taxes "be-

cause of the public nature of the [Foundation] and the purpose for which these lands are held . . . ." For this reason, Hofmann Forest was not taxed by either county.

In 1945, the Foundation entered into a ninety-nine year lease with Halifax Paper Company, Inc., [hereinafter Paper Company] which lease included the following purpose:

> . . . (I)n order to properly prosecute the objects for which the Foundation was organized, it is necessary and desirable that an outlet be found having the disposition by sale of merchantable timber, pulpwood and wood-products, equal to the annual growth of all merchantable timber, trees, and wood, growing upon the real property. . . .

This lease or contract placed upon the Foundation the responsibility for cutting and delivering timber and pulpwood to the Paper Company. The contract provided the Foundation with a source of income for debt payment and equipment.

This contract was amended in 1951 to effectively give the Paper Company operational control of Hofmann Forest. Pursuant to this amendment, the Paper Company and its successors in interest (Albemarle Paper Company and Hoerner-Waldorf Corporation, now Champion International) engaged in extensive construction of roads, drainage ditches and fire lanes within the Forest, in addition to the cutting of timber and pulpwood.

For purposes of this appeal, the most significant provision of the amended contract is as follows:

> On July 2, 1951, Paper Company shall take over and assume authority and responsibility for the operation of Hofmann Forest and fire protection and hunting rights in and on Hofmann Forest; that Paper Company will consult with the Foundation or its representative or representatives, concerning its proposes [sic] master or over all plans for the operation of Hofmann Forest and for hunting and fire protection therein; tha [sic] The Foundation shall review said master or over all plans and make recommendations and suggestions to Paper Company in connection therewith, IT BEING UNDERSTOOD, HOWEVER, THAT THE FINAL AUTHORITY FOR SAID PROGRAMS WILL REST WITH PAPER COMPANY; that during the life of this contract, the Foundation shall be accepted by Paper

Company as a forestry consultant for Hofman [sic] Forest, however, this shall not serve to exclude the use of other consultants should they appear to Paper Company to be desirable. [Emphasis added.]

The Paper Company pays the Foundation one-twelfth (1/12) of the market price for pulpwood and one-sixth (1/6) of the market price for saw timber, which amounts are credited against advances made to the Foundation by the Paper Company. In 1974, the Paper Company cut approximately 270,000 feet of saw timber and 10,700 cords of pulpwood from the Forest. Depending on the work being done, the Paper Company has from twenty-five to one hundred men working in the Forest.

Students and study groups interested in the operation of the Forest are allowed to tour or conduct research in the Forest by permission of the Directors of the North Carolina State University School of Forestry, subject to the contract provision that "such study groups or students will do nothing whatsoever to interfere with any program undertaken or in progress by Paper Company in or on Hofmann Forest." Other groups and individuals have conducted research in the Forest, and the results of such studies have been widely disseminated. The Paper Company has never denied access to groups or individuals engaged in research in the Forest. In addition, there appears to be an ongoing program for the development of forest fire control techniques.

In 1969, the Attorney General expressed his opinion that the Forest was no longer exempt from ad valorem taxes. The Foundation, as a nonprofit organization holding timberland for the benefit of an educational institution, opted, pursuant to G.S. 105-295.1, to pay 10 cents per acre per year in lieu of county taxes which would otherwise be assessed against such timberland. From 1969 to 1973, the Foundation made payments in lieu of county ad valorem taxes to both Jones County and Onslow County. In 1971, G.S. 105-295.1 was renumbered G.S. 105-279, and the provisions allowing the payment of 10 cents per acre in lieu of county ad valorem taxes was repealed effective 1 July 1973.

In 1974, the Foundation received from the Onslow County Tax Collector a notice of tax assessment for the Hofmann Forest. The Foundation appealed the taxation of the Forest to the Onslow County Board of Commissioners, which rejected the appeal.

In 1975, the Foundation filed applications for exemption with the tax supervisors of Jones and Onslow Counties. These applications were denied, and the Foundation filed application for a hearing before the North Carolina Property Tax Commission. After conducting a hearing in January, 1976, the Commission rendered separate decisions adverse to the Foundation.

The Foundation then filed petitions for review by the Superior Court. The Foundation's appeals were heard at the 25 October 1976 term of Wake County Superior Court by Judge Herring, who entered judgments affirming in all respects the final decision of the Property Tax Commission.

The Foundation appealed to the Court of Appeals which, in separate decisions of 7 March 1978, affirmed the judgments entered by the superior court.

We allowed the Foundation's petition for discretionary review and consolidated the cases for hearing and decision.

*Poyner, Geraghty, Hartsfield & Townsend, by Thomas L. Norris, Jr., and Curtis A. Twiddy, attorneys for petitioner North Carolina Forestry Foundation, Inc.*

*Joyner & Howison, by R. C. Howison, Jr., and James E. Tucker, attorneys for respondents, Jones and Onslow Counties.*

*James R. Hood, attorney for Jones County.*

*Roger A. Moore, attorney for Onslow County.*

BRANCH, Justice.

The primary question presented by this appeal is whether the Hofmann Forest is exempt from ad valorem taxation. The Onslow County case also presents the question as to whether the county, through procedural default, is precluded from collecting ad valorem taxes for the years in question, 1974 and 1975. An additional question in the Jones County case is whether the land has been properly valued for ad valorem tax purposes.

We first consider the exemption question.

The Foundation relies upon four statutes (G.S. 105-275(12), 105-278.4, 105-278.6, and 116-16) as alternative bases for its contention that the Hofmann Forest land is exempt from ad valorem taxes.

The first three of these statutes require that the property be used *exclusively* for one exempt purpose or another. The pertinent provisions of these three statutes are:

§ 105-275. *Property classified and excluded from the tax base.* — The following classes of property are hereby designated special classes under authority of Article V, Sec. 2(2), of the North Carolina Constitution and shall not be listed, appraised, assessed, or taxed:

*   *   *

(12) Real property owned by a nonprofit corporation or association *exclusively held and used by its owner for educational and scientific purposes as a protected natural area.* (For purposes of this subdivision, the term "protected natural area" means a nature reserve or park in which all types of wild nature, flora and fauna, and biotic communities are preserved for observation and study.) [Emphasis added.]

§ 105-278.4. *Real and personal property used for educational purposes.* — (a) Buildings, the land they actually occupy, and additional land reasonably necessary for the convenient use of any such building shall be exempted from taxation if:

(1) Owned by an educational institution (including a university, college, school, seminary, academy, industrial school, public library, museum, and similar institution);

(2) The owner is not organized or operated for profit and no officer, shareholder, member, or employee of the owner or any other person is entitled to receive pecuniary profit from the owner's operations except reasonable compensation for services;

(3) Of a kind commonly employed in the performance of those activities naturally and properly incident to the operation of an educational institution such as the owner; and

(4) *Wholly and exclusively used for educational purposes by the owner or occupied gratuitously by another nonprofit educational institution* (as defined herein)

*and wholly and exclusively used by the occupant for nonprofit educational purposes.*

(b) Land (exclusive of improvements); and improvements other than buildings, the land actually occupied by such improvements, and additional land reasonably necessary for the convenient use of any such improvement shall be exempted from taxation if:

(1) Owned by an educational institution that owns real property entitled to exemption under the provisions of subsection (a), above;

(2) Of a kind commonly employed in the performance of those activities naturally and properly incident to the operation of an educational institution such as the owner; and

(3) *Wholly and exclusively used for educational purposes by the owner or occupied gratuitously by another nonprofit educational institution* (as defined herein) *and wholly and exclusively used by the occupant for nonprofit educational purposes.* [Emphasis added.]

§ 105-278.6. *Real and personal property used for charitable purposes.* — (a) Real and personal property owned by:

\*    \*    \*

(7) A nonprofit, life-saving, first aid, or rescue squad organization;

\*    \*    \*

shall be exempted from taxation if: (i) As to real property, it is *actually and exclusively occupied and used,* and as to personal property, it is entirely and completely used, *by the owner for charitable purposes;* and (ii) the owner is not organized or operated for profit. [Emphasis added.]

[1] The focal point in interpreting three of these exemptive statutes is whether the Foundation *exclusively* used the property for one of the exempted purposes. The Foundation stressfully contends that its use of the property brings it within the excluding

language of the statute and argues that where the property is used for educational purposes, the general rule requiring a statute to be construed strictly must yield to a less narrow and stringent construction. The Foundation apparently relies upon the following language from *Seminary, Inc. v. Wake County*, 251 N.C. 775, 112 S.E. 2d 528 (1960):

> By the rule of strict construction, however, is not meant that the statute shall be stintingly or even narrowly construed * * * but it means that everything shall be excluded from its operation which does not clearly come within the scope of the language used. . . .

However, the Foundation can find little comfort in this statement. In our opinion, this language does not appear to be inconsistent with the Court's flat statement that statutes exempting property from taxation because of the purposes for which property is held and used are construed against exemption and in favor of taxation. We note that *Seminary* also stands for the well-recognized rule that the words used in a statute must be given their natural or ordinary meaning.

*Webster's Third New International Dictionary* lists the words "sole" and "single" as synonymous for the word "exclusive." We also find the following in *Ballentine's Law Dictionary*, Second Edition:

> *exclusive*. The Century Dictionary defines the word as meaning, "appertaining to the subject alone; not including, admitting, or pertaining to any other or others; undivided; sole; as, an exclusive right or privilege; exclusive jurisdiction."

The Foundation nevertheless contends that the term "exclusively" is not to be construed literally and that in the statutes here considered the word refers to the primary and inherent activity and does not preclude incidental activities related to the primarily exempt activity. In support of this position, the Foundation relies upon the case of *Rockingham County v. Elon College*, 219 N.C. 342, 13 S.E. 2d 618 (1941). In that case, Elon College, an educational institution, owned and rented buildings for business purposes to private enterprise and the net profit from these rentals was exclusively used for educational purposes. In affirming

the decision of the trial court which held that the property was subject to ad valorem taxes, the Court in part stated:

> "The power to grant exemptions under authority of the second sentence in Art. V, sec. 5, which may be exercised in whole, or in part, or not at all, as the General Assembly shall elect, is limited to property held for one or more of the purposes therein designated. *Southern Assembly v. Palmer*, 166 N.C., 75, 82 S.E., 18; *United Brethren v. Comrs.*, 115 N.C., 489, 20 S.E., 626. Property held for any of these purposes is supposed to be withdrawn from the competitive field of commercial activity, and hence it was not thought violative of the rule of equality or uniformity, to permit its exemption from taxation while occupying this favored position. But when it is thrust into the business life of the community, it loses its sheltered place, regardless of the character of the owner, for it is then held for profit or gain. *Trustees v. Avery County*, 184 N.C., 469, 114 S.E., 696. . . . It is not the character of the corporation or association owning the property which determines its status as respects the privilege of exemption, but the purpose for which it is held. *Grand Lodge, F. A. M. v. Taylor*, 146 Ark., 316, 226 S.W., 129. This is the plain meaning and intent of the Constitution. *Corp. Com. v. Construction Co., supra.*"

> \*     \*     \*

> . . . The fact that a commercial enterprise devotes its entire profits to a charitable or other laudable purpose does not change the character of its business nor the purpose for which it is held. It is still a commercial enterprise, and is held as such. . . .

For like holdings, *see Odd Fellows v. Swain*, 217 N.C. 632, 9 S.E. 2d 365 (1940); *Guilford College v. Guilford County*, 219 N.C. 347, 13 S.E. 2d 622 (1941); *Redevelopment Comm. v. Guilford County*, 274 N.C. 585, 164 S.E. 2d 476 (1968).

[1] On this record, we conclude that the requisite exclusive use has not been shown. Our conclusion is compelled by the Paper Company's virtually complete operational control of the Forest pursuant to the contract as amended in 1951. With respect to the operation of the Forest, the 1951 contract amendment provided

that "the final authority for said programs will rest with Paper Company . . . ." The record indicates that from 1951 to the present time, the Hofmann Forest has been primarily used by the Paper Company as commercial property. While we recognize the Forest's importance as an educational and scientific resource and the value of research conducted there, we cannot escape the conclusion that the use of the Forest in this regard is incidental to the activities of the Paper Company. This conclusion is supported by the record and by the provision of the amended contract which states that "study groups or students will do nothing whatsoever to interfere with any program undertaken or in progress by Paper Company in or on Hofmann Forest."

[2] The Foundation's arguments for exemption under the statutes cited above fail on other grounds. G.S. 105-275 exempts real property "exclusively held and used by its owner for educational and scientific purposes as a protected natural area." The statute defines "protected natural area" as "a nature reserve or park in which all types of wild nature, flora and fauna, and biotic communities are preserved for observation and study." The Hofmann Forest does not come within the statutory definition of a "protected natural area" due to the extensive program of road building, construction of drainage ditches and fire lanes, site preparation, including disking and burning, leasing of hunting rights to local hunting clubs, and the cutting of timber and pulpwood. While such activities may well constitute prudent management techniques, they certainly do not result in the preservation of "all types of wild nature, flora and fauna . . . ."

G.S. 105-278.4 exempts real property which is "wholly and exclusively used for educational purposes by the owner or occupied gratuitously by another nonprofit educational institution . . . and wholly and exclusively used by the occupant for nonprofit educational purposes." We have already concluded that said property is not "exclusively used" by the Foundation. Neither is it "occupied gratuitously by another nonprofit educational institution . . . and wholly and exclusively used by the occupant [Paper Company] for nonprofit educational purposes." On the contrary, the Forest is used by the Paper Company, obviously not a nonprofit educational institution, as a commercial enterprise.

[3] G.S. 105-278.6(a)(7) exempts real property owned by "a non-profit, life-saving, first aid, or rescue squad organization" if the property is "actually and exclusively occupied and used . . . by the owner for charitable purposes." We have concluded that the property in question is not "exclusively used" by the Foundation. Furthermore, we disagree with the Foundation's contention that, due to the placement of commas, any nonprofit organization comes within the purview of this statute. Applying the rule of *ejusdem generis*, it is apparent that "nonprofit" is limited to "life-saving, first aid, or rescue squad organizations." Had the Legislature intended such a broad exemption so as to include *all* nonprofit organizations, it would have so stated without beclouding its intention by the use of the specific type organization set out in G.S. 105-278.6(a)(7).

[4] Finally, the Foundation contends that the Hofmann Forest is exempt under G.S. 116-16, which provides:

> The lands and other property belonging to the University of North Carolina shall be exempt from all kinds of public taxation.

We note that the Foundation is the sole owner of the Forest. Examination of this record discloses that the University of North Carolina has no legal or equitable title to the land in question. Thus, the land simply does not "belong" to the University of North Carolina.

We hold that the Court of Appeals correctly decided that the Foundation did not use the Forest exclusively for an exempt purpose and is not entitled to the exemption applicable to lands "belonging to the University of North Carolina."

The Foundation next contends that Onslow County, through procedural default, is precluded from collecting ad valorem taxes for 1974 and 1975. This question does not involve Jones County.

From 1969 to 1973, the Foundation paid 10 cents per acre pursuant to G.S. 105-279, in lieu of county taxes which would otherwise be assessed against the Forest. This option was not available in 1974 or 1975 as it was deleted when the statute was amended effective 1 July 1973.

On 15 July 1974, the Foundation received a tax notice from Onslow County showing an ad valorem tax liability of $25,466.40 for 1974.

By letter dated 11 November 1974, the Foundation notified the Onslow County Board of Commissioners that it objected to the Forest being subjected to taxation and sought to present its exemption claim to the Board. The Onslow County Manager informed the Foundation in a letter dated 13 January 1975 that the County Commissioners had rejected the Foundation's letter of 11 November 1974 but would be willing to meet with the Foundation to consider any presentation it wished to make.

The Foundation wrote the County Manager on 29 January 1975 to inform him that it would file a formal application for exemption of Hofmann Forest for 1975. The Foundation requested that any meeting with the Commissioners concerning the 1974 tax liability be deferred until action had been taken on the 1975 application for exemption. The Foundation's application for exemption was sent by certified mail on 30 January 1975 to the office of the Onslow County Tax Supervisor. This application was received and signed for, apparently by someone in the Tax Supervisor's office, but the Tax Supervisor testified that he never saw the application.

On 1 August 1975, Onslow County sent the Foundation a tax notice showing a total 1975 ad valorem tax liability of $23,558.98 for the Onslow portion of Hofmann Forest. The Foundation never received acknowledgment of its application for exemption.

On 4 December 1975, pursuant to an application filed by the Foundation, the Property Tax Commission conducted a full *de novo* hearing into Onslow County's assessment of Hofmann Forest for 1974 and 1975 ad valorem taxes. The Commission affirmed these assessments.

Upon appeal by the Foundation, the decision of the Commission was affirmed by the superior court which in turn was affirmed by the Court of Appeals.

[5] The Foundation argues that the 1974 tax assessment was improper due to Onslow County's failure to give the Foundation notice of the discovery and listing of the property as required by G.S. 105-312(d). We do not agree.

From 1969 to 1973, the Hofmann Forest property had been subject to payment of 10 cents per acre, pursuant to G.S. 105-279, in lieu of county taxes otherwise assessed, which payments had in fact been made. These payments in lieu of ad valorem taxes, necessitated by the Attorney General's opinion in 1969 that the property was no longer exempt, lead us to the conclusion that the property was neither exempt from taxation under G.S. 105-278 nor excluded from the tax base by G.S. 105-275. Furthermore, during the time the Foundation made these payments, it did not contend that the property was either exempt or excluded from the tax base. Thus, the property should have been listed as required by G.S. 105-285.

Upon failure of the Foundation to list this property, it became incumbent upon Onslow County tax officials to discover and list the property pursuant to G.S. 105-312 and G.S. 105-303(b). It appears from the Onslow County tax records, which properly set forth the name and address of the Foundation, the acreage in Onslow County and the payments made thereon pursuant to G.S. 105-279, that the property was, in fact, listed. The Onslow County Tax Supervisor testified that he listed the property in 1974 as the Foundation no longer had the option of paying 10 cents per acre in lieu of taxes. The Tax Supervisor also testified that he did not give the Foundation any notice that the property was being listed. Thus, he did not comply with the discovery procedures of G.S. 105-312(d) which require that notice be sent to the taxpayer.

On the facts here presented, the Tax Supervisor's failure to send the Foundation the required notice is not fatal to the 1974 tax assessment. The purpose of the notice requirement is to inform the taxpayer that his property is subject to ad valorem taxation. When, in 1969, the Foundation began making payments in lieu of paying the "county taxes otherwise assessed . . ." pursuant to G.S. 105-279, it was, or should have been, aware that its property was included in the tax base. Otherwise, it would not have been required to make these payments as there would have been *no* "county taxes otherwise assessed . . . ." As everyone is presumed to know the law, the Foundation was charged with the knowledge that the option of making payments in lieu of taxes was not available in 1974. *Pinkham v. Mercer*, 227 N.C. 72, 40 S.E. 2d 690 (1946). Thus, the Foundation should have known that its property was subject to ad valorem taxation.

Although failure to timely notify the Foundation that its property had been discovered delayed its opportunity for a hearing on the matter, this delay did not adversely affect the Foundation's rights. The Foundation was given a full *de novo* hearing before the Property Tax Commission which decided the exemption issue adversely to the Foundation. Thus, although the Tax Supervisor was derelict in not giving the Foundation notice of the tax listing as required by G.S. 105-312, we are of the opinion that this omission did not amount to a denial of due process.

In the Jones County case, the Foundation challenged the county's valuation of the Forest for ad valorem tax purposes.

The Foundation's appraisal expert testified that for the 31,648 acres in Jones County, the average value per acre was approximately $50. Moreover, he was of the opinion that this valuation should be discounted by about 25 percent due to the Hoerner-Waldorf lease which would influence the price a willing buyer would pay for the property. Thus, he felt that the proper valuation of the property would be between $30 and $36 per acre.

The Jones County Tax Supervisor and Jones County's regular appraiser both valued the land at $100 per acre. This valuation was adopted by the Tax Commission.

[6]   The lowest rate on the Jones County schedule was $60 per acre, which is higher than the average unadjusted value per acre arrived at by the Foundation's appraiser. As ad valorem tax assessments are presumed to be correct, the burden of proof is on the taxpayer to show that the assessment was erroneous. *In re Appeal of Amp, Inc.*, 287 N.C. 547, 215 S.E. 2d 752 (1975). In order for the taxpayer to rebut this presumption, he must produce competent, material and substantial evidence that the county tax supervisor used an arbitrary or illegal method of valuation and that the assessment substantially exceeded the true value in money of the property. *In re Appeal of Amp, Inc., supra.*

[7]  The record indicates that the county's appraisers divided the property into four classifications, based on soil type, location, and ability of the land to produce, and assigned a different value to each classification. The method used by the county's appraisers was consistent with the presumption that ad valorem assessments are correct. The Foundation has failed to present material and

substantial evidence that the method used was arbitrary or illegal.

In its brief filed in this Court, the Foundation contends that the Court of Appeals misconstrued the effect given by the Foundation to Hoerner-Waldorf's leasehold estate. The Court of Appeals apparently thought that the Foundation's contention was that the value of the lease should be excluded from the assessment of ad valorem taxes. The Court of Appeals correctly decided that such exclusion would be erroneous. By way of clarification, the Foundation informs us that, in its appraisal of the property, the leasehold estate was considered solely as an encumbrance on the property which would be considered by a willing buyer as affecting the fair market value of the property. It appears then that the Foundation's position, simply stated, is that its valuation of the property, rather than the County's valuation, should have been adopted by the Tax Commission. The Commission is free, however, after considering the evidence and weighing the pertinent factors, to adopt the assessment it deems to be proper. Where, as here, the findings of the Tax Commission are supported by competent, material and substantial evidence, they are binding on appeal. *In re Appeal of Amp, Inc., supra.*

For the reasons stated herein, the decisions of the Court of Appeals are affirmed.

Affirmed.

Justice BROCK took no part in the consideration or decision of this case.