IN THE MATTER OF THE APPEAL OF THE ATLANTIC COAST CONFERENCE

No. 9210PTC527

(Filed 21 September 1993)

**Taxation § 22.1 (NCI3d)— property tax exemption filed by ACC—
statutory ownership requirement met—property used for pur-
poses incident to operation of educational institution—property
used exclusively for educational purposes—insufficiency of
evidence to determine pecuniary profit**

In a case arising out of a requested property tax exemp-
tion filed by the ACC on property located in Guilford County
which the ACC used for the operation of its administrative
offices, the Property Tax Commission did not err in finding
that: (1) the ACC was not a separate entity from its constituent
schools and that since each member was an educational institu-
tion, exempt from taxation, then the ownership requirement
of N.C.G.S. § 105-278.4 was met; (2) the property was employed
in the performance of those types of activities which are natural-
ly and properly incident to the operation of an educational
institution, the negotiation of television network contracts and
management of broadcasts in collegiate athletics being necessari-
ly incidental to the operation of educational institutions; and
(3) the property was used wholly and exclusively for educa-
tional purposes as that term is used in the applicable statute,

1

IN RE APPEAL OF ATLANTIC COAST CONFERENCE

[112 N.C. App. 1 (1993)]

because the predominant purposes to which the property was dedicated were television contract negotiation and organization and administration of conference tournaments, both of which qualified as educational, as they sought to bring out the best in the individual athletes and had as one of their goals the development of the skills of the participants. However, the Commission erred in holding that none of the individual member institutions was organized for profit and that no person was entitled to receive any "pecuniary profit," except reasonable compensation, where the only finding to support this holding was that 8% of the ACC's revenues for the year were used for administrative expenses, while the remainder was distributed to the member institutions; there was no evidence in the record as to how the funds retained by the ACC were spent; the salaries and compensatory perks of all ACC commissioners and employees as well as the remaining administrative expenses were all relevant and needed to be known and determined to be reasonable; and it was not possible to determine if anyone or any entity such as a private organization received any "pecuniary profit" without this information.

**Am Jur 2d, State and Local Taxation §§ 332, 362, 363, 365, 366, 374, 382, 383.**

Judge MCCRODDEN dissenting.

Appeal by Guilford County from Final Decision of the Property Tax Commission sitting as the State Board of Equalization and Review entered 25 February 1992. Heard in the Court of Appeals 26 April 1993.

*Jonathan V. Maxwell, County Attorney, and Joyce L. Terres, Assistant County Attorney, for Taxing Authority-Appellant.*

*Smith Helms Mulliss & Moore, by Bynum M. Hunter and Matthew W. Sawchak, for Atlantic Coast Conference-Appellee.*

LEWIS, Judge.

The facts of this case arise out of a requested property tax exemption filed by the Atlantic Coast Conference (the "ACC") for 1989. The ACC owns property located at Landmark Center, Guilford County, which it uses for the operation of its administrative offices.

The ACC estimated the value of its property to be $974,518, consisting of $188,518 for the real property, $612,000 for improvements, and $174,000 for personal property. On 13 April 1989 the ACC filed an Application for Property Tax Exemption pursuant to N.C.G.S. § 105-278.4 for the Landmark Center property. This request was denied by both the County Tax Department and the Board of Equalization and Review. The ACC then gave Notice of Appeal to the North Carolina Property Tax Commission ("Commission") which on 25 February 1992 entered its decision reversing the Board of Equalization, finding that the ACC did qualify for a property tax exemption under N.C.G.S. § 105-278.4. Guilford County has now appealed the decision of the Property Tax Commission to this Court.

A brief review of the ACC and its objectives is helpful in understanding the issues presented by this appeal. In 1989 the ACC was composed of eight member institutions: Clemson, Duke, Georgia Tech, Maryland, North Carolina, North Carolina State, Virginia and Wake Forest. Florida State joined the ACC in 1991. The ACC, with headquarters in Greensboro, administers approximately seventeen conference championships in various athletic competitions and negotiates television contracts for the broadcast of these championships and other athletic contests. The ACC derives income from the annual conference tournaments, regular season football and basketball television coverage and post-season coverage of both football and basketball games. Of the money derived from these various sources a percentage is retained to pay for the operation of the administrative offices as well as the salaries of the employees. The ACC has approximately fifteen employees including a Commissioner, six Assistant Commissioners, and various administrative personnel. The ACC is governed by a Board of Directors and an Executive Committee which is staffed by the employees of the ACC as well as faculty representatives from the member institutions. All money after administrative costs is divided among the member institutions under a plan approved by the Conference, with each institution receiving an equal share except when an institution participated in some event which would increase its share.

Guilford County contends that the ACC is not an educational institution itself, and that the Landmark Center is not actually used for an educational purpose. Thus, according to Guilford County the ACC does not qualify for an exemption under N.C.G.S. § 105-278.4 (1992) which provides:

(a) Buildings, the land they actually occupy, and additional land reasonably necessary for the convenient use of any such building shall be exempted from taxation if:

(1) Owned by an educational institution (including a university, college, school, seminary, academy, industrial school, public library, museum, and similar institution);

(2) The owner is not organized or operated for profit and no officer, shareholder, member, or employee of the owner or any other person is entitled to receive pecuniary profit from the owner's operations except reasonable compensation for services;

(3) Of a kind commonly employed in the performance of those activities naturally and properly incident to the operation of an educational institution such as the owner; and

(4) Wholly and exclusively used for educational purposes by the owner or occupied gratuitously by another nonprofit educational institution (as defined herein) and wholly and exclusively used by the occupant for nonprofit educational purposes.

The wording and the construction of N.C.G.S. § 105-278.4 make it clear that there are four separate and distinct requirements which the ACC must meet in order to qualify for an educational exemption. As a general rule the burden is on the taxpayer to prove entitlement to an exemption. *Sir Walter Lodge No. 411 v. Swain*, 217 N.C. 632, 9 S.E.2d 365 (1940) ("[t]axation is the rule; exemption the exception."). This burden is substantial and often difficult to meet because all property is subject to taxation unless exempted by a statute of statewide origin. N.C.G.S. § 105-274. In addition, statutes exempting property are construed so that everything is excluded except that which clearly comes within the scope of the language used. *Wake County v. Ingle*, 273 N.C. 343, 160 S.E.2d 62 (1968).

The extent of our review of the Commission's decision is governed by N.C.G.S. § 105-345.2 which provides for a review of the whole record. *In re Appeal of Perry-Griffin Foundation*, 108 N.C. App. 383, 424 S.E.2d 212, *disc. rev. denied*, 333 N.C. 538, 429 S.E.2d 561 (1993). "In reviewing whether the whole record fully supports the Commission's decision, this Court must evaluate whether the Commission's judgment, as between two reasonably conflicting views,

is supported by substantial evidence, and if substantial evidence is found, this Court is not permitted to overturn the Tax Commission's decision." *Id.* at 394, 424 S.E.2d at 218 (citations omitted). In order to determine whether substantial evidence was present in the record, we have examined the elements of N.C.G.S. § 105-278.4 in light of the Commission's conclusions of law.

## A.

### Owned by an educational institution.

In its first two conclusions of law, the Commission held that the ACC was not a separate entity from its constituent schools and that since each member was an educational institution, exempt from taxation, then the ownership requirement was met. In support of this conclusion, the Commission found that the ACC was an unincorporated association consisting of eight member institutions.

It is uncontroverted that the ACC is an unincorporated association, and property titled in the name of an unincorporated association belongs to its members. *Venus Lodge No. 62 v. Acme Benevolent Ass'n*, 231 N.C. 522, 58 S.E.2d 109 (1950). As a result we agree with the Commission's conclusion that the Landmark Center property is owned by the individual member institutions.

Guilford County contends that the ACC is the actual owner of the property and not the individual members. In support of this argument the County cites the ACC's Constitution which provides that a member who is expelled from the ACC shall no longer maintain any interest in the property of the Conference. Guilford County's argument disregards the nature of unincorporated associations and the fact that title to the Landmark Center is held in the name of "Atlantic Coast Conference unincorporated association." The fact that the true owners of the property are the individual member institutions is shown by the fact that upon dissolution of the Conference each member institution would receive an equal share. The mere fact that the member institutions have agreed in the ACC's Bylaws and Constitution to be subject to disciplinary actions, including expulsion and other penalties, does not negate their ownership interest. We find that substantial evidence exists in the record to support the Commission's conclusions on the issue of ownership.

B.

Not for Profit.

In its third conclusion of law the Commission held that none of the individual member institutions was organized for profit and that no person was entitled to receive any "pecuniary profit," except reasonable compensation. The Property Tax Commission's findings of fact in support of this conclusion are not voluminous. In fact, the only finding made by the Commission relating to this element was that 8% of the ACC's revenues during 1989 were used for administrative expenses, while the remainder was distributed to the member institutions. As further evidence of its nonprofit nature, the ACC cites its Bylaws which provide that the purpose of the Conference is

> to promote intercollegiate athletics, to keep it in proper bounds by making it an incidental and not the principal feature of college and university life, and to regulate it by wise and prudent measures in order that it may improve the physical condition, strengthen the moral fibre of students, and form a constituent part of that education for which universities and colleges were established and are maintained.

However, this does not conclude our examination into the second requirement of section 105-278.4(a). According to part (2) of 105-278.4(a), no employee or shareholder of an educational institution may receive any "pecuniary profit" other than reasonable compensation for services. Our review of this issue is made difficult because the term "pecuniary profit" is not defined in the statute. At oral argument counsel for the ACC offered the definition that "pecuniary profit" meant the diversion of income to someone who was not entitled to claim an exemption.

Our review of this issue is further frustrated by the lack of evidence in the record indicating how the funds retained by the ACC were spent. Whenever Guilford County requested pertinent information, its requests were frustrated by protective orders and other objections. The only evidence in the record as to how the ACC spent the 8% concerns the salaries of its commissioners. During the hearing before the Property Tax Commission, Assistant Commissioner Bradley Faircloth was asked about the various salaries of the commissioners. The ACC objected to this inquiry on the basis that it was irrelevant and the objection was sustained. This

**IN RE APPEAL OF ATLANTIC COAST CONFERENCE**

[112 N.C. App. 1 (1993)]

was error. "Reasonable compensation" is allowed under the exemption statute but in order to ascertain its reasonableness, it must be known. All compensation, be it monetary or as "perks," must be known. Guilford County was allowed to make an offer of proof that the Commissioner makes approximately $180,000 and has the use of a car, and that the six assistant commissioners make between $45,000 and $75,000 each. We do not find these salaries to be unreasonable given the responsibilities of the commissioners. However, the salaries and compensatory perks of the other employees as well as the remaining administrative expenses are all relevant and must be known and determined to be reasonable as well. Although Mr. Faircloth testified that the salaries of the commissioners were set and that no bonuses or incentives were received based on how much income the ACC generated, we still have no evidence in the record as to how the balance of the 8% allocated to administrative expenses was spent. It is not possible to determine if anyone or any entity such as a private organization received any "pecuniary profit" without this information. It is necessary to know how the funds were spent if we are to determine the issue of "pecuniary profit."

Before we leave this issue, we feel compelled to address the reluctance of the ACC and the constituent universities to disclose pertinent financial information. The County was unable to obtain this information directly from the ACC so on 2 July 1990 the County attempted to obtain copies of the ACC's annual audit and balance sheets from the University of North Carolina and North Carolina State University by virtue of Chapter 132 of the North Carolina General Statutes, which provides for public disclosure. Both are public institutions and both are members of the ACC. The record indicates a response to the County's inquiry only from John Swofford, the athletic director at the University of North Carolina. Mr. Swofford replied:

> I write in response to your letter of July 2 to the University Registrar at the University of North Carolina at Chapel Hill requesting financial records on the Atlantic Coast Conference.
>
> I write to let you know that we do not have in our possession the annual audit or balance sheets from the ACC for the past two years. This information is not sent to the Conference member schools, and would have to be obtained from the Atlantic Coast Conference office.

We find this response to be less than forthcoming, especially when the 1991 ACC Manual indicates that Mr. Swofford was the chairman of the ACC's Committee on Television. Considering that his school was entitled to one-eighth of the net revenues of the ACC it would seem at least desirable, if not necessary, to have the audit, balance sheets or some equivalent information in order to competently do his job. If technically he did not have the documents in his possession, he certainly had the information.

We hold that the balance sheets and audits are relevant and discoverable. Without knowing how $1.9 to $2.2 million was spent, it cannot be ascertained whether or not any person or entity received "pecuniary profit" or if anyone received unreasonable compensation. .

Since we specifically disavow the percentage approach urged by the ACC, the financial information sought by Guilford County was relevant and necessary. During the hearing before the Commission and during oral argument before this Court, the ACC stated that the disclosure of specific financial information was not necessary and that the real focus should be on whether or not 8% of $24 to $28 million ($1.9 to $2.2 million) is reasonable for the administration of the Conference headquarters. We do not believe the legislature intended for a percentage method to be applied. The statute does not state that "8% or less of the income may go for pecuniary profit" before property loses its exemption. *No* pecuniary profit is permitted if property is exempted. We remand on this issue.

C.

Incident to the operation of an educational institution.

The third provision of section 105-278.4(a) is that the property must be employed in the performance of those types of activities that are naturally and properly incident to the operation of an educational institution. It is undisputed that athletic activities are a natural part of the education process whether they be intercollegiate or intramural. *See In re Forsyth County Tax Supervisor*, 51 N.C. App. 516, 277 S.E.2d 91, *disc. rev. denied*, 303 N.C. 544, 281 S.E.2d 391 (1981). In *Forsyth County* this Court held that a portion of a parking lot reserved for football games qualified as being used wholly and exclusively for educational purposes. *Id.* Guilford County has conceded the importance of athletics in education, but argues that the facts of this case are distinguishable

from those in *Forsyth County* because the ACC's headquarters are used for contract negotiation and management and not for athletic events. We disagree.

As stated in *National Collegiate Realty Corp. v. Board of County Commissioners*, 690 P.2d 1366, 1371 (Kan. 1984), "[t]he fact that the subject property is utilized for administration rather than programs directly and immediately involved with the education of students is not, in itself, a bar to the requested exemption." In today's climate of national broadcasting and ESPN, mega-million dollar contracts for basketball and football coverage are commonplace. Educational institutions must necessarily engage in the marketing of their athletic teams to be able to afford to maintain and improve the facilities and equipment of their athletic teams. Had the member institutions of the ACC not formed this alliance to strengthen their collective bargaining position, then each individual institution would have been required to conduct its own contract negotiations with the major networks. Guilford County claims that if these activities were conducted on the individual campuses then the institutions would have crossed the line from educational to commercial. In that case the County claims that a percentage of the buildings where these activities took place would be subject to ad valorem taxes. We do not believe that the legislature intended such an awkward result when it drafted section 105-278.4. We hold that in collegiate athletics, the negotiation of network contracts and management of broadcasts are as necessarily incidental to the operation of educational institutions as is the maintenance of a parking lot, and it matters not whether these activities take place at the Landmark Center in Greensboro, in Duke Chapel, in Watauga Hall, at the Old Well or in the Worrell Professional Center.

### D.

#### Wholly and exclusively used for educational purposes.

The Property Tax Commission also concluded that the property at the Landmark Center was used wholly and exclusively for educational purposes as that term is used in N.C.G.S. § 105-278.4. Section (f) of 105-278.4 defines an educational purpose as one which "has as its objective the education or instruction of human beings, it comprehends the transmission of information and the training or development of knowledge or skills of individual persons." In deciding whether or not something qualifies as an educational purpose, our courts have consistently held "that it is not the nature

or the character of the owning entity which ultimately determines whether property shall be exempt from taxation, but it is the use to which the property is dedicated which controls." *In re Forsyth County Tax Supervisor*, 51 N.C. App. 516, 520, 277 S.E.2d 91, 94, *disc. rev. denied*, 303 N.C. 544, 281 S.E.2d 391 (1981).

Since it is the use to which the property is dedicated which controls, we have undertaken an examination of the ways in which the ACC uses the Landmark Center to determine if these uses have as their objective the instruction of students and the development of skills. After reviewing the record, we find that there are two predominant purposes to which the ACC's property is dedicated: 1) television contract negotiation, and 2) organization and administration of Conference tournaments. Both of these activities qualify as "educational." These Conference tournaments bring out the best in the individual athletes as they seek individual honors and victories for their schools. There can be no doubt that the sponsorship of these tournaments has as one of its goals the development of the skills of the participants.

The role of the ACC is to promote college athletics, particularly ACC college athletics. Part of this role involves negotiating television contracts, following NCAA rules and regulations regarding eligibility and in some cases even establishing more stringent rules concerning academic eligibility. The Supreme Court of Kansas held that these and similar activities conducted by the NCAA helped to endow college athletics with a rich academic tradition which differentiated them from professional sports. *National Collegiate Realty Corp. v. Board of County Comm'rs*, 690 P.2d 1366, 1373 (Kan. 1984). The Supreme Court of Kansas went on to conclude that the NCAA headquarters qualified for an exemption because it was used exclusively for educational purposes. We find the opinion of the Kansas Court to be persuasive, not only because of the similarities in the functions of the ACC and the NCAA, but also because the Kansas property exemption statute has an exclusive use provision like our own in N.C.G.S. § 105-278.4(a)(4).

In its brief and at oral argument, Guilford County relied heavily on *In re North Carolina Forestry Association*, 296 N.C. 330, 250 S.E.2d 236 (1979). There, our Supreme Court addressed the situation where a nonprofit foundation owned a forest for the purposes of promoting improved forestry methods, and for the production and preservation of timber. Another purpose of the foundation

**IN RE APPEAL OF ATLANTIC COAST CONFERENCE**

[112 N.C. App. 1 (1993)]

was the promotion of forestry research and education at North Carolina State University. In determining whether the forest was held exclusively for an exempt purpose, the Supreme Court held that the exclusive use element was not met because a paper company actually occupied and used the forest for commercial purposes, making the educational use merely incidental. We feel that *Forestry Association* is distinguishable from the case at bar because the ACC is an unincorporated association made up of educational institutions and not a commercial enterprise as was the paper company. In addition, the use of the Landmark Center is not commercial in nature but instead, as we discussed in section C, is properly incidental to the activities of an educational institution. We find that substantial evidence exists in the record to support the Property Tax Commission's conclusion that the Landmark Center was used wholly and exclusively for educational purposes.

We are not charged with determining the validity of the concept of the "student athlete" nor its application in the ACC. Nor can we challenge the oft heard complaint that college sports are "big business." We must answer this issue as to whether or not the property of the ACC at the Landmark Center is exempt under the law. We note Guilford County's argument that the ACC generates enormous reserve. We find nothing in the law to indicate that the scope of monetary success has any bearing on this case or any exception. We find no merit in that contention.

Remanded for further hearings before the Property Tax Commission as to the disposition of the balance of the $1.9 to $2.2 million, i.e. the 8%, and whether pecuniary profit was made or unreasonable compensation paid to any employee or associated entity.

Remanded:

Judge COZORT concurs.

Judge McCRODDEN dissents.

Judge McCRODDEN dissenting.

I respectfully dissent from the majority's conclusion that the property owned by the Atlantic Coast Conference (ACC), if its expenditure of administrative funds does not violate N.C. Gen.

Stat. § 105-278.4(a)(2) (1992), is tax exempt. Before turning to my analysis of the governing statute, I would like to join the majority in its chastising of a representative of the University of North Carolina who evaded a request by Guilford County for ACC financial data pertinent to its decision in this matter. Both the University of North Carolina and North Carolina State University, members of the ACC, are public institutions and are subject to the Public Records Law, N.C. Gen. Stat. §§ 132-1 to -9 (1991). They may not avoid their responsibilities in disclosing records which are deemed public under the law or, for that matter, to accomplish indirectly any other prohibited act by virtue of their membership in the ACC. The University representative's actions were, at best, disappointing.

I reject the majority's conclusions (1) that the member institutions own the subject property; (2) that the ACC is not operated for profit; (3) that the activities of the ACC are "[o]f a kind commonly employed in the performance of those activities naturally and properly incident to the operation of an educational institution such as the owner;" and (4) that the owner uses the property wholly and exclusively for educational purposes.

First, as an unincorporated association, the ACC may and does hold the Landmark property in its own name. N.C. Gen. Stat. § 39-24 (1984) states:

> Voluntary organizations and associations of individuals organized for charitable, fraternal, religious, social or patriotic purposes, when organized for the purposes which are not prohibited by law, are hereby authorized and empowered to acquire real estate and to hold the same in their common or corporate names and may sue and be sued in their common or corporate names concerning real estate so held: Provided, that voluntary organizations and associations of individuals, within the meaning of this Article, shall not include associations, partnerships or copartnerships which are organized to engage in any business, trade, or profession.

The ACC is a voluntary organization of member institutions united to maximize the proceeds they can derive from athletic events and can apply, at least in part, to educational goals. The Supreme Court has defined charitable institutions to include educational institutions. *See, e.g., Reynolds Foundation v. Trustees of Wake Forest College*, 227 N.C. 500, 42 S.E.2d 910 (1947).

**IN RE APPEAL OF ATLANTIC COAST CONFERENCE**

[112 N.C. App. 1 (1993)]

The statute does not define the word *individual*. I do not, however, believe that the use of this term excludes the member institutions of the ACC. Indeed, *Venus Lodge No. 62 v. Acme Benevolent Ass'n.*, 231 N.C. 522, 58 S.E.2d 109 (1950), the case cited by the ACC and relied upon by the majority for the proposition that property titled in the name of an unincorporated association belongs to its members, defined an unincorporated association as "merely a body of *individuals* acting together, without a corporate charter, but upon the methods and forms used by incorporated bodies, for the prosecution of some common enterprise." *Id.* at 526, 58 S.E.2d at 112 (emphasis added).

*Venus*, which repeated the common law principle that an unincorporated association "is not an entity, and has no existence independent of its members . . . [and] has no capacity at common law to contract; or to take, hold, or transfer property; or to sue or be sued," involved a transfer of property occurring in 1937, two years before the enactment of N.C.G.S. § 39-24. *Id.* (citations omitted). It is not, therefore, dispositive of the ownership question. For purposes of real property, N.C.G.S. § 39-24 establishes an unincorporated association as an entity in and of itself.

I would further point out that *Venus* is distinguishable on other grounds as well. *Venus* involved the transfer of property to which *all* members of the unincorporated association agreed. In the case under review, since a majority of member institutions could oust other members, that same majority could, in essence, transfer the subject property. This fact belies the concept that all member institutions own the property and underscores the fact that the ACC is a separate entity possessing some powers which supersede those of its members. Since the educational institutions do not own the subject property, Guilford County may properly subject it to taxation.

Second, I also disagree with the majority in its application of that part of N.C.G.S. § 105-278.4(a)(2) which requires that the owner of exempt property not be organized or operated for profit. *Black's Law Dictionary* defines the word *profit* to be "the gross proceeds of a business transaction, less the costs of the transaction . . . . Gain realized from business or investment over and above expenditures." Black's Law Dictionary 1211 (6th ed. 1991). There is no question but that the ACC operates for profit. Indeed, one of its purposes is to pool its resources so as to maximize

profits. The fact that it returns part of that profit to the member institutions, and they in turn apply a portion to non-athletic pursuits, does not, in light of *Rockingham County v. Elon College*, alter this:

> The fact that a commercial enterprise devotes its entire profits to a charitable or other laudable purpose does not change the character of its business nor the purpose for which it is held. It is still a commercial enterprise, and is held as such. . . . So, when an educational institution sees fit to engage in an outside competitive business for the purpose of increasing its revenues, the trade part of its business falls into the category of a commercial undertaking.

219 N.C. 342, 346-47, 13 S.E.2d 618, 621 (1941). As a profit-making enterprise, the ACC is not exempt from paying property taxes.

Third, I also reject the majority's determination that the property is "[o]f a kind commonly employed in the performance of those activities naturally and properly incident to the operation of an educational institution such as the owner." N.C.G.S. § 105-278.4(a)(3). In its broadest sense, education comprehends the whole course of training — moral, mental and physical, 71 Am. Jur. 2d *State and Local Taxation* § 382 (1973), and, to be sure, athletics are geared toward development of a student's physical well-being. To extend this truism to encompass the ACC and "today's climate of national broadcasting and ESPN, mega-million dollar contracts for basketball and football coverage" is a perversion of education in the classic sense. The ACC's quest for exemption from property tax fails on this requirement as well.

Finally and logically following from the foregoing analysis, the ACC's activities on the Landmark Center property are not wholly and exclusively for educational purposes. In this case there can be little doubt that the marketing of broadcast rights for sporting events is a commercial enterprise. Collegiate sports programming competes directly with commercially produced entertainment programming. It matters not that the proceeds are eventually dedicated, in part, to the educational purpose of athletics at the schools. *See Rockingham County v. Elon College*, 219 N.C. 342, 13 S.E.2d 618.

In light of the ACC's failure to meet any of the requirements to exempt its property from taxation, I would vote to reverse the decision of the North Carolina Property Tax Commission and to hold the ACC accountable for taxes on the Landmark Center.