Richard D. Simons, J.
This case presents the question of whether Syracuse University is entitled to exemption under section 420 of the Real Property Tax Law for certain property used for administrative offices, classrooms and student housing. The respondent City of Syracuse has taxed several parcels of property involved in this litigation, claiming they were not necessary or incidental to the maintenance of the university for carrying out the purposes for which it was organized (People ex rel. Blackburn v. Barton, 63 App. Div. 581). The city contends that the curriculum offered was not an educational use of the property and also that the property was in excess of the university’s needs.
Real property is exempt under the statute if it is owned by a corporation organized exclusively for statutory purposes and is used exclusively for such purposes without pecuniary profit to any individual officer, member or employee except reasonable compensation. Syracuse University is an educational corporation. There is no prohibited profit to any officer, member or employee from its operation. There remains the question of whether or not the property was exclusively used for educational purposes.
Specifically in issue is the Continuing Education Program and that branch of it known as Continuing Education for Public Service. The real property involved is known as 420 and 438 Jamesville Avenue, the “Vincent”, consisting of 8 interconnected buildings containing apartments for married students, staff offices for the Director of the Continuing Education Program for Public .Service, and some classroom area. Also involved is part of the property located at 1117 and 1119 E. Genesee Street which is used for administrative offices for the *686 Continuing Education Program and parking and the parking lot adjacent to it at 120 Ashworth Place.
Under well-established rules, these properties are exempt unless there is something in the nature of the use which precludes exemption. Thus, dormitory buildings containing apartments for married students and their families are exempt. (Matter of St. Luke’s Hosp. v. Boyland, 12 N Y 2d 135, 141; People ex rel. Clarkson Mem. Coll. of Technology v. Haggett, 191 Misc. 621, affd. 274 App. Div. 732, affd. 300 N. Y. 595; People ex rel. Buffalo Turn Verein v. Reuling, 155 Misc. 797, affd. 257 App. Div. 902; Matter of Syracuse Univ. 214 App. Div. 375; Church Divinity School of the Pacific v. County of Alameda, 152 Cal. App. 2d 496.) Classroom buildings, administrative offices, and parking lots are also exempt. (People ex rel. Blackburn v. Barton, supra; Matter of Syracuse Univ., supra.)
Syracuse University is a well-known educational institution offering courses on both the graduate and undergraduate levels. It also has one of the five largest continuing education programs in the United States and annually teaches approximately 5,000 students in this program offered both in the City of Syracuse and at several other locations in New York State. This action concerns only the continuing education activities in Syracuse involving 2,000 to 3,000 students annually.
The Continuing Education Department offers courses for resident or nonresident students ranging in age from 18 to 86 years. They are not necessarily college or high school graduates. Most courses are designed for a specific pui’pose, to suit a specific client and to teach specific students. The courses are rarely repeated and they are not open generally to other students, although in some instances students from other schools in the.university are permitted to enroll. Some of the courses offer degree credits, but most do not. They are designed by the university staff and approved usually by the funding agency or sponsor. In some cases, the university solicits the courses from government or industry and in some cases, sponsors seek out the university. They are taught variously by university faculty, visiting instructors, persons with practical experience in the field but not formally qualified as teachers (“ para-professionals ”) and, sometimes, by seminar-type group discussion. The length of the courses ranges from one day seminars or conferences to two years. The largest dollar amount, several million dollars, has been paid by the Federal Government for such programs as the training of volunteers for the Peace Corps and Vista, and training instructors for the Headstart *687 Program and Manpower Training Program. Over 800 foreign students, mainly Africans, were enrolled in courses on leadership training, nation building and management, under contracts with the United States Government. The government also sponsored courses to update the knowledge of government scientists, train its management personnel, and on public health and nursing. The State of New York funded programs on such subjects as local government, consumer education, reading, and teacher training. Several large industries have sponsored management training programs for company officials. There have been a variety of courses and seminars for municipal officials and real estate courses for real estate brokers.
The greatest controversy centers around a group of courses, not necessarily related, but which all pertain in one way or another to race relations and social problems and organized under the direction of the Continuing Education Program for Public Service.[1]. [2].
Respondent says that this program of continuing education is not education in any traditional sense, that it far transcends the normal university program and that to allow exemption of the real property used to implement it frustrates the legislative purpose behind the statute.
It is the declared policy of this State that property used for educational purposes shall be exempt from local taxes and that the general welfare is furthered by such exemption. (Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, 1 N Y 2d 508; N. Y. Const., art. XVI, § 1.) The legislative intent was to promote education. While the statute must be strictly construed, it must be construed with that intent and purpose in mind and not with any superimposed requifement that there be a direct correlative benefit to the State from the exemption, except in the broadest terms of the general welfare. *688 (St. Barbara’s R. C. Church v. City of New York, 243 App. Div. 371.) Section 420 of the Real Property Tax Law is not based upon the quid pro quo theory that colleges perform an educational function discharging a burden resting on the State. (People ex rel. Doctors Hosp. v. Sexton, 267 App. Div. 736, affd. 295 N. Y. 553; People ex rel. Clarkson Mem. Coll. of Technology v. Haggett, supra.) The construction of New York’s statute differs from others in this respect. (84 C. J. S., Taxation, § 215.)
The property in question was directly and actually used by the petitioner to teach students with faculty, either professional or nonprofessional, retained by the university in courses of instruction planned and organized under university direction.
The only things unique about this program of continuing education were: 1. the nature of the courses; 2. the method of financing; 3. the method of selecting the students, and 4. the credit received for completion of the course.
The term ‘ ‘ educational ’ ’ is comprehensive, embracing mental, moral and physical education. (W. David Curtiss, Tax Exemption of Educational Property in New York, 52 Cornell L. Q., p. 551.) (51 Am. Jur., Taxation, § 620, p. 596.) Under a statute granting exemption to “ literary, benevolent, charitable and scientific institutions ”, a school for young girls offering such subjects as child psychology, family relationships, significance of play and play materials, music in the home, home cookery and table service, crafts, etc. was granted tax exemption. (Assessors of Boston v. Garland School of Home Making 296 Mass. 378.) Institutions which are really not schools at all, such as art galleries, research organizations and home and farm bureaus, have been classified as educational organizations under the New York statute. (58 N. Y. Jur., Taxation, § 125.) Directly in point is Experiment in International Living, Inc. v. Town of Brattleboro (127 Vt. 41). The instruction offered by plaintiff in that case was almost identical with the subjects questioned in this case and the highest court of Vermont declared the property was devoted to an educational use although exemption was denied because of other requirements in the Vermont statute.
As for the race relations courses, some of the material is pretty heady stuff consisting of theory and practical advice generously laced with cliches. It is the city’s position that in many instances these courses went beyond the teaching stage and actively engaged the university in promoting civil strife and disorder under the guise of education. If the university consciously became an instrument primarily for propaganda *689 or political action, the exempt status of the property involved would be affected. (Matter of Daly, 79 Misc. 586, affd. 163 App. Div. 949, affd. 215 N. Y. 620; Workmen’s Circle Educational Center v. Assessors of Springfield, 314 Mass. 616.) The record does not establish that it did so. It is the court’s function to examine the type and character of the use of the property and not pass judgment on the quality of the education offered. (People ex rel. Johnson O’Connor Research Foundation v. Tax Comrs. of City of N. Y., 96 N. Y. S. 2d 36.) Whatever merit or lack of merit there was in the subject matter of the courses, the teaching of them was an educational use of the property within the definition of the statute.
The university’s position is not affected by the fact that some of the programs are supported by government or industry funds. The exemption does not depend upon the source of the tuition, or even require that tuition be paid. The only statutory restriction is that such payments as are made must not result in pecuniary profit to officers, members or employees. Furthermore, it would be an unusual public policy that denied exemption to a university because it implemented government policy by training government personnel or volunteers for government programs. (Roman Catholic Diocese of Brooklyn v. City of New York, 38 Misc 2d 815.) The city says that the government courses were funded by open-end contracts paying all expenses and that the petitioner could have and should have included real estate taxes on the property as an expense. Maybe so, but they were not required to do so.
The students in many of these courses were a closed group, selected by the sponsor, and for reasons and qualifications not necessarily known or determined by the university. The courses were not open to others in most instances. The statute does not require that the instruction be open to the public or available on an equal basis. Some of the students were undoubtedly unqualified for admission to the university’s undergraduate schools but that is irrelevant. The purpose of continuing education courses was to fill a need in the adult’s life or career, not to build on his or her prior education necessarily. That is the program’s virtue, not its defect.
Finally, the credit received for the course is of little significance. The statute’s purpose is to promote education, not academic degrees.
The “ Vincent ” buildings were first converted to university rentals for the tax year 1963 and full occupancy was not achieved until tax year 1966. The exemption is granted on a prorata basis for those years, as shown in the annexed schedule. *690 (Real Property Tax Law, § 420, subd. 2; Matter of Pratt Inst. v. Boyland, 16 Misc 2d 58, affd. 8 A D 2d 625.) Similarly, only part of 1117 E. Genesee Street and the parking lot at 1119 E. Genesee Street were used by petitioner and the exemption is limited to two thirds of the tax on those properties.
The second argument advanced by the city is that none of the property involved in this proceeding was necessary or incidental to the university’s operation and that, in fact, the university overbought and continuously overbuys real estate. The university now owns 501 tax parcels. Some are outside the city. Many are taxed. Further, it is said that some property was intentionally bought in an urban development area so that public funds could be acquired to defray the cost of modernizing the buildings.
With the exceptions noted below, the property in dispute was all purchased in good faith with the intention of using it for university purposes and it has been so used in the years in question. The petitioner has demonstrated a continuing growth in student population and corresponding need for academic and recreational needs as well as dormitories. Most undergraduates were required to live in university housing and graduate students have had difficulty in finding accommodations.
The dormitories are exempt.[3] The classrooms and offices are exempt.4. The tennis courts are exempt.5. (People ex rel. Adelphi Coll. v. Wells, 97 App. Div. 312, affd. 180 N. Y. 534; Y.W.C.A. of City of N. Y. v. City of New York, 144 Misc. 120, affd. 236 App. Div. 665.) The parking lots are exempt.6. (People ex rel. Blackburn v. Barton, supra; Matter of Syracuse Univ., supra.) There is some public use of the tennis courts and *691 parking lots. Concededly, they are difficult to police. It appears to be de minimis however. The theatre complex at 818 Genesee Street is exempt. (Matter of Little Theatre of Watertown v. Hoyt, Misc 2d 907, affd. 4 A D 2d 853.)
Some of the parking area is in violation of the zoning ordinance. This has no effect on the right to exemption. (Matter of North Manursing Wildlife Sanctuary, 52 Misc 2d 96, revd. on other grounds, 28 A D 2d 891.)
The record does not support petitioner’s right to exemption for some properties. The parking lot at 120 Ashworth Avenue used in conjunction with Dr. Pickett’s property has for the most part been closed off and used by the public. The “ tot lot ” at 815 Madison Avenue was admittedly bought because it was a bargain without any intended use and is now used as a playground by the city. The parking lot at 1000 E. Genesee Street is removed from any other university property and not regularly used by anyone connected with university activities. Admittedly, the university has no construction underway or planned as to any of these properties and those petitions are dismissed. (Real Property Tax Law, § 420, subd. 3.) [Schedule of findings annexed to opinion omitted as unnecessary to understanding of opinion.]
Judgment accordingly for the sum of $513,740.94, with interest as stipulated.

. Foremost is the so-called Community Action Training Program (most of it taught at other buildings), a two-year Federally funded course for both regular graduate students and ghetto residents. Petitioner’s officers described it as primarily sociology. The respondent’s officers describe it as a course to “ teach militants how to storm city hall.” A curriculum was received in evidence. There is something to be said for both descriptions. Other courses included are Civic Leadership Training Programs for ghetto residents; Adult Learning Seminar for 50 clergymen to teach various churches how to plan programs; Mass Media and Race Relations; a Conference on Crime and the Press, and Inner City Education. With commendable impartiality, petitioner taught social action to students and taught police how to handle contemporary problems.

. There were also courses for adults studying for their degrees. These are not in question.

. 1301 E. Genesee Street — “ The Roosevelt ”
417 University Avenue — “The Ambassador”
502 University Avenue —“ The Chaumont ”
600 University Avenue — “ The Seneca ”
603 University Avenue
606 University Avenue — “The Alabama ”
116 Stadium Place
801 S. Crouse Avenue
420 James ville Avenue 438 James ville Avenue “ The Vincent

 801 South Crouse Avenue architectural classrooms and also space
607 University — officers and classrooms for Maxwell School of Public Affairs

 113, 117, 121, 125, 129, 133, 137 Oakland Street

 216 Ashworth Place
218 Ashworth Place
222 Ashworth Place