No. 56,683

NATIONAL COLLEGIATE REALTY CORPORATION and THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *Appellees*, v. BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, *Appellant.*

(690 P.2d 1366)

Opinion filed November 30, 1984.

*Bruce F. Landeck*, assistant county counselor, argued the cause, and *Philip S. Harness*, assistant county counselor, was with him on the briefs for appellant.

*C. W. Crumpecker, Jr.*, of Swanson, Midgley, Gangwere, Clarke & Kitchin, of Kansas City, Missouri, argued the cause, and *Louise L. Lucas*, of the same firm, and *Thomas Van Cleave, Jr.*, of McAnany, Van Cleave & Phillips, P.A., of Prairie Village, were with him on the brief for appellees.

The opinion of the court was delivered by

McFARLAND, J.: National Collegiate Realty Corporation filed a tax grievance application with the Kansas Board of Tax Appeals

seeking exemption from ad valorem taxation for 1980, 1981, 1982 and future years, on certain improved real estate situated in Johnson County. The property is occupied by and used as the national headquarters of the National Collegiate Athletic Association (NCAA) and the association was allowed to join the proceedings as a party in interest. Exemption is sought under K.S.A. 1983 Supp. 79-201 *Second* and article 11, § 1, of the Kansas Constitution on the basis the subject property is used exclusively for educational purposes. The Board of Tax Appeals (BTA), in a divided decision, denied the exemption concluding the property was not being used exclusively for educational purposes.

On appeal, the district court held: (1) The BTA order was arbitrary, capricious and not supported by substantial competent evidence; and (2) the subject property was used exclusively for educational purposes and, hence, entitled to the requested exemption.

The Board of County Commissioners of Johnson County, Kansas, has perfected its appeal to this court and seeks reversal of the district court's decision and affirmance of the order of the BTA.

The BTA made 17 findings of fact in its order and these were adopted by the district court. They are as follows:

"1. The Board has jurisdiction over the subject matter and the parties to this proceeding for the tax years 1980, 1981 and 1982, pursuant to K.S.A. 79-213.

"2. The subject matter of this tax exemption proceeding is real property and the improvements located thereon situated at Nall Avenue at 63rd Street, City of Mission, Johnson County, Kansas containing 3.36 acres more or less, said legal description contained in Key No. KF2512093016 of the Johnson County Appraiser's office. The building itself is a three-story structure with a parking lot on the South side with an exit onto 63rd Street. The entire building is occupied by the NCAA's executive director and his staff which is charged with carrying out the purposes and fundamental policies of the NCAA. Each floor of the building contains offices. Publishing facilities are also located on the second floor. There is a lunchroom on the lower level for employee use. The building is used exclusively as an administrative office building to carry out NCAA's purposes as set out in the constitution of the NCAA.

"3. The National Collegiate Athletic Association by and through the National Collegiate Realty Corporation seeks ad valorem tax exemption on this property for the years 1980, 1981, 1982 and future years; and seeks refund of all taxes paid for the year 1980 and each year thereafter. The applicant asserts the real property is exempt from taxation under Article 2, Chapter 79,

Kansas Statutes Annotated and Article 11, Section 1 of the Kansas Constitution on the basis that the property is used exclusively for educational purposes.

"4. The sole issue in this case is whether the subject real property is used exclusively for educational purposes within the meaning of Kansas law.

"5. The National Collegiate Realty Corporation was incorporated on June 25, 1970, to hold title to property, collect income therefor, and turn over the entire amount thereof, less expenses, to the National Collegiate Athletic Association. The NCRC is a Kansas 'for profit' corporation wholly owned by the NCAA.

"6. The National Collegiate Athletic Association is exempt from federal income tax pursuant to Section 501(c)(3) of the Internal Revenue Code.

"7. The National Collegiate Realty Corporation is exempt from federal income tax pursuant to Section 501(c)(2) of the Internal Revenue Code.

"8. The National Collegiate Athletic Association and the National Collegiate Realty Corporation have been granted exemption from Kansas income tax to the extent that they are exempt from federal income tax.

"9. Until August 1, 1979, a part of the building on the property for which exemption is sought was rented as office space to a non-NCAA entity. During this time, the National Collegiate Realty Corporation did not seek to exempt the property. Since that date the building on the subject property has been solely occupied by NCAA.

"10. The NCAA is a voluntary association of 780 educational institutions, organized and operated to provide rules and regulations pertaining to inter-collegiate support programs. A summary of the NCAA functions revealed, in general terms, that it promotes and develops inter-collegiate sports, establishes rules for approximately 12 different sports (to include enforcement and sanctions against those members who violate the rules), and to hold championship games in approximately 71 divisions.

"11. The formation of the NCAA was traced to one particular problem—the need for rules to curb violence in inter-collegiate football at the commencement of this century. Thus, in its beginning the NCAA's stated objective was to maintain college activities 'on an ethical plane in keeping the dignity and high purposes of education.' The growth of the NCAA beyond its primary work of salvaging football and structuring a formal organization has, indeed, been spectacular. From its humble beginnings and rule-making pertaining to one sport, the organization, and its responsibilities, continued to grow and, in 1973, it was organizationally and procedurally revised. Currently, some of its more important organizational purposes are in the area 1) enforcement, 2) championships, 3) education, 4) broadcasting, 5) rule making and 6) faculty control and eligibility standards. Of these areas, broadcasting has grown into a multi-million dollar income-generator for the organization. The NCAA's testimony was that education is the most important facet of the organization. The NCAA is an organization composed primarily of educators. While the NCAA membership enumerate academic requirements, the question as to whether it is exclusively an *educational* organization, (within the meaning of the Kansas ad valorem exemption laws) is not answered.

"12. Most NCAA member schools have voting powers, but there are about 150 non-voting members, i.e. associate member colleges that do not qualify for active or allied memberships, various athletic conferences, associations and others interested in inter-college athletics.

"13. The NCAA employs 93 persons at the national headquarters building, of which approximately 20% are engaged in the enforcement section, 5% in legislative activities, 18% in the championships department, 22% in media communications, 15% in the publishing department and 20% in general administration. Its annual payroll to these employees is approximately $2,000.000.

"14. NCAA's annual budget in 1980 was in excess of $20,000,000 and in 1981 was over $23,000,000.

"15. Approximately 25% of NCAA's revenue is spent on enforcements, 18% on championships, 22% on communication, 15% on publications, and 20% on general administration.

"16. On April 10, 1972 the Department of Revenue of the State of Kansas exempted the NCAA's building contract from sales and compensating tax with regard to building the national headquarters on the subject building. The Department of Revenue of the State of Kansas found that the property purchased was exempted from sales tax under K.S.A. 79-3606(d) and (e).

"17. The NCAA gives the National Collegiate Realty Corporation however much money it needs to pay the expenses of maintaining the building. The National Collegiate Realty Corporation has no employees and is managed solely by the executive staff of the NCAA. There is no profit developed by the National [Collegiate] Realty Corporation."

Before proceeding further it should be noted that although the subject property and improvements are owned by the National Collegiate Realty Association, said corporation is wholly owned by NCAA and the premises are used exclusively as the national headquarters of the NCAA. The parties do not contend the manner of ownership should have any bearing on the outcome of this litigation and have consistently presented the issues on the basis of whether or not the use made of the property by the NCAA is exclusively for educational purposes.

Article 11, § 1, of the Kansas Constitution provides in pertinent part:

"All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation."

K.S.A. 1983 Supp. 79-201 provides in part:

"**Property exempt from taxation; religious, educational, literary, scientific, benevolent or charitable purposes.** The following described property, to the

extent herein specified, shall be and is hereby exempt from all property or ad valorem taxes levied under the laws of the state of Kansas:

. . . .

"*Second.* All real property, and all tangible personal property, actually and regularly used exclusively for literary, educational, scientific, religious, benevolent or charitable purposes. This exemption shall not apply to such property, not actually used or occupied for the purposes set forth herein, nor to such property held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes."

Questions of whether or not specific properties were entitled to exemptions from ad valorem taxes under the foregoing constitutional and statutory provisions have been before this court many times. These decisions are remarkably consistent in stating the applicable law. The parties in the case before us essentially agree on the applicable law, the dispute being limited to the proper application of that law to the facts herein. Under such circumstances, citing and discussing each case wherein the general law in the field has been reiterated would add nothing to this opinion except bulk. Rather, we shall utilize *Lutheran Home, Inc., v. Board of County Commissioners*, 211 Kan. 270, 505 P.2d 1118 (1973), as a suitable representative of these genus of cases.

In *Lutheran Home* the issue was whether or not property used as a nursing home was exempt from ad valorem taxation on the basis it was operated exclusively for charitable and benevolent purposes. Such purposes are granted exemption by K.S.A. 1983 Supp. 79-201 *Second* and article 11, § 1, of the Kansas Constitution as are properties used exclusively for educational purposes. As in the case before us, the facts in *Lutheran Home* were not disputed. In discussing the legal effect thereof, this court in *Lutheran Home* stated:

"Since the facts are undisputed, the case presents a pure question of law as to whether or not Lutheran Home is entitled to an exemption on the nursing home property under Article 11, Section 1, of the Kansas Constitution and K.S.A. 79-201." 211 Kan. at 275.

The court in *Lutheran Home* then proceeded to summarize the basic principles of law which are applied in cases of claimed exemption from ad valorem taxation because of charitable use of the property as follows:

"(1) Constitutional and statutory provisions exempting property from taxation are to be strictly construed.

"(2) The burden of establishing exemption from taxation is on the one claiming it.

"(3) The exemption from taxation depends solely upon the exclusive use made of the property and not upon the ownership or the character, charitable or otherwise, of the owner.

"(4) The test of whether an enterprise is charitable for ad valorem tax purposes is whether its property is used exclusively to carry out a purpose recognized in law as charitable.

"(5) The question is not whether the property is used partly or even largely for the purposes stated in the exemption provisions, but whether it is used exclusively for those purposes. [Citations omitted.]

"(6) The phrase 'used exclusively' as contained in Section 1, Article 11, of the Kansas Constitution, was intended by the framers in the sense that the use made of property sought to be exempt from taxation, must be only, solely, and purely for the purposes stated in the Constitution, and without admission to participation in any other use." 211 Kan. at 275-76.

The court then stated:

"The principles of law set forth above have generally been accepted and followed in all of our decisions. The major problem presented in this case and in other cases of claimed exemption is whether or not a particular use of property falls within the definition of a use for charitable or benevolent purposes." 211 Kan. at 276.

The balance of the opinion in *Lutheran Home* is devoted to determining what constitutes a charitable use and concluding the operation of the nursing home was not such a use. By substituting the word "educational" for "charitable" wherever the latter appears in the basic principles of law quoted from *Lutheran Home*, we have the law to be applied herein.

Additionally, the fact that the subject property is utilized for administration rather than programs directly and immediately involved with the education of students is not, in itself, a bar to the requested exemption. See *Trustees of The United Methodist Church v. Cogswell*, 205 Kan. 847, 473 P.2d 1 (1970), wherein we held:

"Property used for administrative offices essential to a well organized and efficient system for providing religious, charitable, benevolent or educational benefits to the citizens of Kansas, if used exclusively for religious, charitable, benevolent or educational purposes, falls within the constitutional provision exempting property 'used exclusively for . . . literary, educational, scientific, religious, benevolent and charitable purposes.' " Syl. ¶ 9.

We turn now to the matter of whether the NCAA's use of the

premises is exclusively for educational purposes. Little would be gained by attempting to develop a general definition of "educational purposes" applicable to such diverse needs as exemptions from zoning requirements, income taxation, obscenity laws, or ad valorem taxation. It is doubtful such a definition could be devised. The emphasis in our prior cases, and rightly so, has been placed on whether any activities in the use of the property *were not* exclusively for educational or other exempt purposes rather than any discussion of what uses *were for* exempt purposes. Illustrative thereof is *Kansas State Teachers Ass'n v. Cushman,* 186 Kan. 489, 351 P.2d 19 (1960), which case, incidentally, contains an excellent summary of prior cases involving claimed exemptions. In *Cushman* this court held that the KSTA's headquarters building was not entitled to exemption as the building was:

"used, in part at least, for the individual benefit of the teacher-member; consequently, it is not used directly, immediately, solely, and exclusively for educational purposes . . . ." 186 Kan. at 501.

The NCAA is involved exclusively with regulating and promoting intercollegiate athletic events among its member colleges and universities. There is no serious contention that, generally speaking, physical education and sports programs in universities are not within proper "educational purposes" and we must conclude they are educational. This determination is consistent with the results reached by the courts that have attempted to define "education." The court in *Mtr. of Syracuse Univ.,* 59 Misc. 2d 684, 300 N.Y.S.2d 129 (1969), defined "educational" as embracing mental, moral and physical education. The court noted that the purpose of the statute exempting property used for educational purposes from property taxation "is to *promote education, not academic degrees."* p. 689. (Emphasis supplied.) The court in *Albach v. Odle,* 531 F.2d 983 (10th Cir. 1976), described education as follows:

"The educational process is a broad and comprehensive concept with a variable and indefinite meaning. It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement." 531 F.2d at 985.

See also Senate Report No. 2375, 81st Congress, 2nd Session, reprinted in 1950 U.S. Code Cong. Serv. 3053, 3082, which

acknowledges "[a]thletic activities of schools are substantially related to their educational functions."

"Education" is defined as follows in 71 Am. Jur. 2d, State and Local Taxation § 382, p. 689:

" 'Education,' taken in its full sense, is a broad, comprehensive term, and may be particularly directed to mental, moral, or physical faculties, but in its broadest and best sense it embraces them all, and includes not merely the instructions received at school, college, or university, but the whole course of training— moral, intellectual, and physical. An educational institution has been defined as one which teaches and improves its pupils, that is, a school, seminary, college, or educational establishment."

In concluding the activities of the NCAA did not qualify for the exemption, the BTA stated:

"The Board concludes that the NCAA is not an organization whose functions are exclusively educational. Certainly part of the function of the organization is to educate but just as certainly part of the function is to entertain and part of the function is to coordinate revenue raising activities for its members. The NCAA is a big business raising millions of dollars for the universities through its broadcasting activities. The United States District Court for the Western District of Oklahoma recently held that the NCAA's control over college football makes the NCAA 'a classic cartel.' "

The federal case referred to in the BTA opinion, since the issuance of the order herein, has been the subject of an opinion of the United States Supreme Court. *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. _____, 82 L.Ed.2d 70, 104 S.Ct. 2948 (1984). The issue in the federal court was whether the NCAA was unreasonably restraining trade in the televising of football games. The United States Supreme Court held against the NCAA, but in so doing acknowledged the value of the association's role in regulating intercollegiate sports as follows:

"What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football. The identification of this 'product' with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the 'product,' athletes must not

be paid, must be required to attend class, and the like. And the integrity of the 'product' cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive." 82 L.Ed.2d at 84.

## The United States Supreme Court concluded:

"The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act. But consistent with the Sherman Act, the role of the NCAA must be to *preserve* a tradition that might otherwise die; rules that restrict output are hardly consistent with this role. Today we hold only that the record supports the District Court's conclusion that by curtailing output and blunting the ability of member institutions to respond to consumer preference, the NCAA has restricted rather than enhanced the place of inter-collegiate athletics in the Nation's life. Accordingly, the judgment of the Court of Appeals is affirmed." 82 L.Ed.2d at 96.

As pointed out by the dissent filed to the BTA order and by the district court herein in its memorandum decision, the BTA's denial of the exemption rests largely on the size of the NCAA operation and the amount of money involved in its activities. Were the question before us the NCAA's ability to pay ad valorem taxes, the answer would be a resounding, "Yes!" But such is not the issue.

Sports are a legitimate part of collegiate education. Whether collegiate football and basketball, as they presently exist, are too large and too commercial are philosophical questions outside the issues of this action. No authority has been cited nor has our research disclosed any instance where a university's football stadium or gymnasium has been held taxable on the basis such facilities are commercial or entertainment facilities. The present large size of the NCAA arises from the great popularity with the general public of collegiate football and basketball events. This popularity spawns a myriad of problems such as improper re-cruiting practices which only the NCAA can properly control. The reasoning applied by the BTA appears to be that at some point a collegiate sport may cease to be an educational activity and become merely entertainment. Presumably an intercolle-

giate sporting event such as archery which would be attended primarily by friends and relatives of the athlete is educational, but should the public interest in archery ignite with sufficient intensity, then the sport would become merely entertainment. The logic of this argument is difficult to follow.

The NCAA is a truly unique organization. It has no real counterpart. The association's nearest relative in Kansas is the Kansas State High School Activities Association, Inc. (KSHSAA). In *Gilpin v. Kansas State High School Activities Ass'n, Inc.*, 377 F. Supp. 1233 (D. Kan. 1974), that association was described as follows:

"The Kansas State High School Activities Association is a voluntary non-profit corporation created to regulate, supervise, promote, and develop interscholastic activities among the students of the secondary schools of the State of Kansas. It is not an agency of the state or of any local governmental unit. Nevertheless, it is sanctioned and regulated by state law pursuant to K.S.A. § 72-130 et seq.; a majority of its members are state public schools; its funds come from membership dues derived, in large part, from gate receipts generated by games between members, the majority of which are held in state-owned and state-supplied facilities; it exercises general control over all activities and contests between member schools; it has exclusive control over all state athletic meets; it is authorized to conduct investigations and to assess penalties against member schools for violations of its rules; the principals of each member school are responsible to it in all matters pertaining to inter-school activities; and it determines individual eligibility in all sports." 377 F. Supp. at 1237.

In terms of wealth, the KSHSAA is, indeed, a poor relation of the NCAA, but it is the rough equivalent for Kansas high school athletic programs to the NCAA's role in national intercollegiate sports. The personal property owned by the KSHSAA has been held exempt by the BTA from ad valorem taxes. The order of the BTA granting the exemption on July 31, 1981 (Docket No. 2722-81-TX) states in part:

"The Board . . . exempts the following described property . . . from ad valorem taxation for the reason that said motor vehicles are used by applicant exclusively for educational purposes in that they are regularly and exclusively for promoting and sponsoring activities in member junior and senior high schools in Kansas. K.S.A. 79-201 Second and Article 11, Section 1 of the Kansas Constitution authorizes exemption of property used for said purposes."

The real estate owned by the KSHSAA is also stated to have been held exempt from ad valorem taxes.

The NCAA enjoyed a like exemption for its personal property

by a BTA order issued in 1976 in Docket No. 1878-5, but the same was rescinded by the order on appeal herein.

As previously noted, the facts herein are not in dispute, hence the issue before us is purely a question of law. *Lutheran Home, Inc., v. Board of County Commissioners,* 211 Kan. 270, 275. See also *Sterling Drilling Co. v. Kansas Dept. of Revenue,* 9 Kan. App. 2d 108, 673 P.2d 456 (1983), involving whether certain well drilling was exempt from sales taxes. In discussing the proper standard of review, the Court of Appeals stated:

"We should note, preliminarily, the appropriate scope of judicial review. Two rules are applicable:

1. 'A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority.' *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, Syl. ¶ 1, 436 P.2d 828 (1968).

2. 'The interpretation of a statute is a question of law and it is the function of a court to interpret a statute to give it the effect intended by the legislature.

" 'While the administrative interpretation of a statute should be given consideration and weight it does not follow that a court will adhere to the administrative ruling where the statute is clear and the administrative ruling is erroneous. The final construction of a statute rests within the courts.' *Amoco Production Co. v. Armold, Director of Taxation,* 213 Kan. 636, Syl. ¶¶ 4 & 5, 518 P.2d 453 (1974).

"In our view, this case turns upon the interpretation and application of section 79-3603(p), a matter of statutory construction covered by the second rule mentioned and clearly within the province of the trial court and this court to determine." 9 Kan. App. 2d at 108-09.

The district court herein applied rule 1 and held the BTA order was not substantially supported by the evidence and was arbitrary and capricious. Properly, rule 2 was the applicable standard of review. However, in the district court's memorandum opinion is its determination that the exemption is authorized by K.S.A. 1983 Supp. 79-201 *Second* and article 11, § 1, of the Kansas Constitution.

The activities of the NCAA are varied including rule making, publication and dissemination of information, investigation of recruiting violations and discipline thereof, and promoting championship events. These activities are but parts of the whole program and are so integrated as to preclude separate consideration of the various components. We conclude that the subject property, the national headquarters of the NCAA, is property used exclusively for educational purposes within the meaning of

K.S.A. 1983 Supp. 79-201 *Second,* and article 11, § 1, of the Kansas Constitution.

The judgment of the district court reversing the order of the Board of Tax Appeals is affirmed.

SCHROEDER, C.J., dissenting: On the facts found by the Board of Tax Appeals and adopted by the district court, it is my opinion the Board of Tax Appeals was correct in its conclusion the property used as headquarters of the National Collegiate Athletic Association was not exclusively used for educational purposes.

The function of the NCAA to entertain the public through televising collegiate games, resulting in revenues of approximately $20 million annually to the NCAA, cannot be classified as exclusively educational. This is big business.

It is respectfully submitted the property of the NCAA is subject to the payment of ad valorem taxes.