(270 P.3d 1218)
No. 105,072

In the Matter of the Application of BOY SCOUTS OF AMERICA QUIVIRA COUNCIL for Exemption from Ad Valorem Taxation in Chautauqua County, Kansas.

Opinion filed February 17, 2012.

*Wyatt A. Hoch*, of Foulston Siefkin LLP, of Wichita, and *James D. Oliver*, of the same firm, of Overland Park, for appellant Boy Scouts of America Quivira Council.

*Robert J. Perry*, county attorney, and *Victor W. Miller*, of Topeka, for appellee Chautauqua County.

Before GREENE, C.J., HILL, J., and MICHAEL E. WARD, District Judge, assigned.

GREENE, C.J.: The Quivira Council of the Boy Scouts of America (BSA) appeals from the denial by the Kansas Court of Tax Appeals (COTA) of its application for an ad valorem tax exemption for its 3,575-acre ranch in Chautauqua County, arguing that COTA erred in holding the ranch was not regularly used by a community service

organization for the predominant purpose of providing humanitarian services, and that COTA also erred in holding the nonexempt use of the ranch was not minimal in scope and insubstantial in nature when compared to any exempt uses. Concluding that COTA's decision is fraught with error, we reverse and remand with directions to restore exempt status to the ranch.

## FACTUAL AND PROCEDURAL BACKGROUND

BSA is a tax-exempt organization that qualifies for federal income tax exemption under Internal Revenue Code § 501(c)(3). BSA was originally incorporated as a not-for-profit corporation in 1924. All property and assets are irrevocably dedicated to the charitable and educational purposes of carrying on the program of the Boy Scouts of America. The directors of BSA serve without pay, and no officers, directors, or members of BSA have a financial interest in the ranch.

From 1960 through 1974, BSA obtained seven contiguous parcels of largely unimproved land—approximately 3,100 acres of land and a 500-acre lake—in Chautauqua County. The ranch is operated as the Quivira Scout Ranch and has been exempt from ad valorem taxation since its acquisition under the provision exempting property used "exclusively for educational, charitable and/or benevolent purposes." See K.S.A. 2010 Supp. 79-201 *Second.*

In 2009, the Chautauqua County Appraiser put the ranch back on the tax rolls, effective January 1, 2009, and no longer recommended the tax exemption because BSA had leased a portion of the land for cattle grazing and allowed guided turkey and deer hunts on the property during hunting season. In addition to these non-Scouting uses, fishing was permitted under limited circumstances. Private individuals (approximately 30 people per year) were allowed to fish at the ranch during a 1-year period as recognition for contributions/donations to the Boy Scouts of $1,000. Finally, BSA entered a lease with Kansas Electric Power Cooperative, Inc., allowing placement of communication equipment on a water tower located on the ranch for annual payments of $840. The Appraiser apparently deemed these uses rendered the property ineligible for exemption.

BSA submitted applications to COTA requesting tax exemption under K.S.A. 2010 Supp. 79-201 *Second* and *Ninth*.

After an evidentiary hearing, COTA denied BSA's requests for exemption from ad valorem taxation under K.S.A. 2010 Supp. 79-201 *Second* and *Ninth*. Regarding the request for tax exemption under K.S.A. 2010 Supp. 79-201 *Second*, COTA determined BSA's use of the ranch was not exclusively for an exempt purpose because the cattle grazing and guided hunts on the property could not be considered minimal in scope and insubstantial in nature because they occurred "on all portions of the property" and during 50-70% of the year. COTA further reasoned the payments received for nonexempt uses and BSA's decision to enter a federal environmental incentive program indicated the ranch was an investment tool, which is prohibited under K.S.A. 2010 Supp. 79-201 *Second*.

Regarding BSA's request for tax exemption under K.S.A. 2010 Supp. 79-201 *Ninth*, COTA first determined BSA was not a community service organization organized for the purpose of providing humanitarian services because it was specifically organized for charitable and educational purposes and failed to show that it served a demonstrated community need. Second, COTA found BSA was not the sole operator of the ranch in light of the grazing lease and the guided hunts. Citing *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 973 P.2d 176 (1999), COTA ruled these ranch lessees were co-operators of the ranch and could "never" meet the organizational requirements under K.S.A. 2010 Supp. 79-201 *Ninth*. Finally, even if they were not co-operators, COTA found the lessees' use of the ranch was not minimal in scope or insubstantial in nature.

BSA timely filed a petition for reconsideration regarding the exemption under K.S.A. 2010 Supp. 79-201 *Ninth*, thereby abandoning the request for a tax exemption under K.S.A. 2010 Supp. 79-201 *Second*. After COTA denied the petition for reconsideration, BSA timely petitioned for judicial review.

STANDARDS OF REVIEW

COTA made no separately numbered findings of fact, and to the extent the facts were critical to its decision, BSA does not challenge

these facts. Instead, BSA contends COTA erred in applying the applicable statutory exemption to these facts. Judicial review of COTA orders is governed by K.S.A. 2010 Supp. 77-621. We may reverse COTA's decision only if "the agency has erroneously interpreted or applied the law." K.S.A. 2010 Supp. 77-621(c)(4). Because the issue presented in this appeal concerns the application and interpretation of K.S.A. 2010 Supp. 79-201 *Ninth,* a question of law, this court has unlimited review and owes no deference to COTA's statutory interpretation. See *Kansas Dept. of Revenue v. Powell,* 290 Kan. 564, 567, 232 P.3d 856 (2010); *In re Tax Exemption Application of Kouri Place,* 44 Kan. App. 2d 467, 471-72, 239 P.3d 96 (2010). The taxpayer has the burden of proving the invalidity of COTA's action. See K.S.A. 2010 Supp. 77-621(a)(1).

While statutes imposing a tax must be interpreted strictly in favor of the taxpayer, statutes granting exemptions are interpreted strictly in favor of the tax and against allowing the exemption. This rule of strict construction does not warrant unreasonable construction. *In re Tax Exemption Application of Mental Health Ass'n of the Heartland,* 289 Kan. 1209, 1211, 221 P.3d 580 (2009).

## DID COTA ERR IN CONCLUDING BSA WAS NOT ORGANIZED FOR THE PREDOMINANT PURPOSE OF PROVIDING HUMANITARIAN SERVICES?

COTA's decision was multifaceted in arriving at the conclusion that BSA was not organized for humanitarian services under K.S.A. 2010 Supp. 79-201 *Ninth.* First, COTA concluded that BSA was not so organized because its articles of incorporation stated that it was organized "exclusively for charitable and educational purposes." Next, COTA concluded that BSA's organizational purpose required that BSA's eligibility for exemption must be determined under K.S.A. 2010 Supp. 79-201 *Second,* which COTA held was mutually exclusive from K.S.A. 2010 Supp. 79-201 *Ninth.* Finally, COTA concluded that BSA failed to show that it was serving a demonstrated community need, so it had not met the requirements of K.S.A. 2010 Supp. 79-201 *Ninth* in any event. We respectfully disagree with COTA on all three conclusions.

The relevant statutory language provides an exemption for:

"All real property and tangible personal property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services, which is owned and operated by a corporation organized not for profit under the laws of the state of Kansas or by a corporation organized not for profit under the laws of another state and duly admitted to engage in business in this state as a foreign not-for-profit corporation if:

. . . .

"(d) the corporation is organized for the purpose of providing humanitarian services." K.S.A. 2010 Supp. 79-201 *Ninth*.

*The Statement of Purpose in BSA's Articles of Incorporation Is Consistent with Providing Humanitarian Services.*

COTA's decision was based in part on its conclusion that BSA was not organized for humanitarian services, but rather for "charitable and educational purposes." COTA held:

"The applicant is a not-for-profit corporation organized 'exclusively for charitable and educational purposes.' The Court finds that the applicant is not a community service organization organized for the purposes of providing humanitarian services, but is a corporation organized for charitable and educational purposes. K.S.A. 79-201 *Second* specifically provides an exemption for property used exclusively for charitable and educational purposes. K.S.A. 79-201 *Ninth* was created by the Legislature for humanitarian uses that did not qualify as charitable or educational."

From this language, we perceive that COTA believed that in determining an organization's purpose, one need look no further than an organizational statement in that corporation's articles of incorporation. We disagree. We are unaware of any statutory or caselaw authority for this proposition, and COTA cites none. Our appellate courts have often determined the organizational purpose of an entity for purposes of ad valorem tax exemption, and we have never held that the articles of incorporation were the singular definitive source for this determination. See, *e.g.*, *National Collegiate Realty Corp. v. Board of Johnson County Comm'rs*, 236 Kan. 394, 690 P.3d 1366 (1984). As we note below, consideration of BSA's bylaws would have supported a humanitarian purpose for the organization.

Additionally, we disagree that a stated purpose of "charitable and educational activities" cannot be inclusive of "humanitarian purposes." The common dictionary definition of "charitable" is "[g]enerous in giving financial or other aid to the needy." Websters

II New Riverside University Dictionary 250 (1984); see Black's Law Dictionary 266 (9th ed. 2009). This is entirely consistent with the statutory definition of "humanitarian," which includes activities "which improve the physical, mental, social, cultural or spiritual welfare of others or the relief, comfort or assistance of persons in distress or any combination thereof . . . ." See K.S.A. 2010 Supp. 79-201 *Ninth*. We believe that COTA's apparent understanding of humanitarian to include services that are not otherwise charitable or educational would undermine legislative intent for these exemption statutes "to *broaden* the scope of property that is exempt by virtue of its charitable or humanitarian use." See *Mental Health Ass'n of the Heartland*, 289 Kan. at 1217.

In short, the formal statement of purpose in a corporation's articles is not the sole and definitive source for determining whether that corporation may be organized for the providing of exempt services. Moreover, the humanitarian services referenced in K.S.A. 2010 Supp. 79-201 *Ninth* have never been interpreted to be exclusive of either charitable or educational purposes. COTA erred in so holding.

*K.S.A. 2010 Supp. 79-201 Second and K.S.A. 2010 Supp. 79-201 Ninth Are Not Mutually Exclusive.*

COTA expressly or impliedly held that these two statutory subsections are mutually exclusive, stating:

"K.S.A. 79-201 *Second* specifically provides an exemption for property used exclusively for charitable and educational purposes. K.S.A. 79-201 *Ninth* was created by the Legislature for humanitarian uses that did not qualify as charitable or educational. The Court does not believe that K.S.A. 79-201 *Ninth*, with its predominant use requirement, was created to allow an exemption for a property used only in part for educational purposes in lieu of the used exclusively requirement of K.S.A. 79-201 *Second*."

Citing *Mental Health Ass'n of the Heartland*, BSA correctly notes that COTA's apparent application of the more-specific-statute rule of construction was improper. In *Mental Health Ass'n of the Heartland*, the Board of Tax Appeals (BOTA), the forerunner of COTA, denied a tax exemption on property operated as an apartment building for homeless low-income people who suffered from men-

tal handicaps and other physical disabilities. BOTA determined the property could fit under the terms of 79-201 *Second* and *Ninth*; however, 79-201b *Fourth* specifically controlled tax exemptions for specialized uses of property. Because the property at issue did not fit all the statutory requirements of 79-201b *Fourth*, BOTA denied the application. Our Supreme Court found BOTA improperly applied the more-specific-statute rule of construction, holding there was no conflict between these statutes. See 289 Kan. at 1215-18. Specifically, the court held that "it is possible . . . for property to qualify under the former statutes [79-201 *Second* or *Ninth*] without qualifying under [79-201 *Fourth*], and vice versa." 289 Kan. at 1217. Significantly, the court noted "the legislative history of the three statutes in question shows a clear intent on the part of the legislature to *broaden* the scope of property that is exempt by virtue of its charitable or humanitarian use." 289 Kan. at 1217. Clearly, these exemption statutes are not intended to be mutually exclusive but rather cumulative.

Additionally, the legislative history of K.S.A. 2010 Supp. 79-201 *Ninth* indicates it was passed in response to the restrictive "exclusive use" limitations of K.S.A. 2010 Supp. 79-201 *Second*, as well as BOTA decisions that narrowly interpreted this exemption. Our Supreme Court has acknowledged that passage of 79-201 *Ninth* marked a major shift in policy. Organizations that cannot demonstrate their property was used exclusively for charitable, educational, scientific, or religious purposes can potentially qualify for a tax exemption under 79-201 *Ninth* even if their purpose is either charitable or educational. See *Univ. of Kan. School of Medicine,* 266 Kan. at 756-57, 768-69. COTA erred in holding K.S.A. 2010 Supp. 79-201 *Second* and K.S.A. 2010 Supp. 79-201 *Ninth* to be mutually exclusive.

*BSA Was Organized for the Predominant Purpose of Providing Humanitarian Services and to Meet a Community Need for such Services.*

Finally, COTA held that BSA had not provided evidence to indicate that it was serving a demonstrated community need, stating:

"Even if the applicant were found to be a community service organization as required by K.S.A. 2009 Supp. 79-201 *Ninth*, the Court finds that the applicant has not provided any evidence to indicate that the applicant is serving a demonstrated community need. The applicant has not provided evidence as to how the services offered are needed in the community and/or how the applicant is satisfying that need. Therefore, the Court concludes that the applicant does not satisfy the statutory requirements of K.S.A. 2009 Supp. 79-201 *Ninth*."

The statutory definition of "humanitarian services" includes a requirement that the organization conduct activities which "meet a demonstrated community need." The complete statutory definition provides:

"As used in this clause, 'humanitarian services' means the conduct of activities which substantially and predominantly meet a demonstrated community need and which improve the physical, mental, social, cultural or spiritual welfare of others or the relief, comfort or assistance of persons in distress or any combination thereof including but not limited to health and recreation services, child care, individual and family counseling, employment and training programs for handicapped persons and meals or feeding programs." K.S.A. 2010 Supp. 79-201 *Ninth*.

BSA asserts the record contains the sworn testimony of its executive director that clearly established the ranch served a demonstrated community need. The executive director testified BSA covers a territory of 30 counties in southern and southeast Kansas, which includes Chautauqua County, and serves 13,000 young people. He testified the mission and purpose of BSA are reflected in the corporation's bylaws. The bylaws specifically state:

"The corporation shall promote, within the territory covered by the charter from time to time granted it by the Boy Scouts of America and in accordance with the Congressional Charter, Bylaws, and Rules and Regulations of the Boy Scouts of America, the Scouting program of promoting the ability of boys and young men and women to do things for themselves and others, training them in Scoutcraft, and teaching them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by the Boy Scouts of America. In achieving this purpose, emphasis shall be placed upon the educational program of the Boy Scouts of America and the oaths, promises, and codes of the Scouting program for character development, citizenship training, and mental and physical fitness."

We are loathe to declare such noble purposes to be less than humanitarian. The promotion of self-reliance; the encouragement of good deeds for others; the development of patriotism, courage,

and character; and the advancement of mental and physical fitness certainly fit within the statutory requirement of "improv[ing] the physical, mental, social, cultural or spiritual welfare of others." If the Boy Scout program as defined by BSA's bylaws is less than humanitarian in its purpose, it would be difficult to conceive of many organizations that could meet the statutory definition.

In response, Chautauqua County admits some of BSA's activities on the ranch might fit the definition of humanitarian services, but the County contends COTA's finding that BSA was organized "exclusively for charitable and educational purposes" was not unreasonable or arbitrary principally because its articles of incorporation and corporate bylaws use the terms "train," "teach," and "emphasis shall be placed on the educational program" to describe its purpose.

The definition of "humanitarian purposes" is expansive and, contrary to the County's argument, educational programs are not outside the scope of humanitarian services. See *Univ. of Kan. School of Medicine*, 266 Kan. at 756-58, 763-64 (charter stated the "principal purposes or functions of the corporation shall include the instruction and training of students, undergraduate, graduate and postgraduate, enrolled in the University of Kansas School of Medicine"). Our appellate courts have considered the definition to be expansive in approving a host of services as humanitarian in nature. See, *e.g.*, *Mental Health Ass'n of the Heartland*, 289 Kan. 1209 (medical services); *In re Tax Exemption Application of Mercy Health System of Kansas, Inc.*, 29 Kan. App. 2d 375, 26 P.3d 78 (2001) (rehabilitation services); *9200 Santa Fe Corp. v. Board of Johnson County Comm'rs*, 19 Kan. App. 2d 91, 864 P.2d 742 (1993) (a job-readiness program for teenagers and programs for the development of children's fitness were deemed humanitarian services); *In re Tax Exemption Application of Hutchinson's Historic Fox Theatre, Inc.*, No. 90,145, 2003 WL 22119343 (Kan. App. 2003) (unpublished opinion) (cultural or theater programming was considered humanitarian services). Under the statute's broad definition of humanitarian purposes, the ranch should have been viewed as improving the physical, mental, social, cultural, and spir-

itual welfare of Boy Scouts in Chautauqua County, as well as the other counties in southern and southeastern Kansas.

We are persuaded that serving 13,000 young people demonstrates a service that is wanted and needed. In addition to the number of young people served, the Executive Director pointed out organizations funding BSA, including United Way, do so based solely on the ability to show a demonstrated need and specific outcome. The fundraising promotional material with endorsements from former Secretary of Defense Robert Gates and former Senator Bob Dole, a minor aspect of BSA's exhibits, were provided to demonstrate their support and recognition of the need for services provided through the ranch, even though these exhibits may not have addressed the specific need during the tax year at issue.

The County argues on appeal that community need should be assessed based on meeting a need within the County where the property is located. The argument is premised on the fact that Chautauqua County will bear 100% of the burden if the ranch acreage is removed from the tax rolls, so the County suggests that, to be exempt, the property should be meeting a need within the "community" of the county affected. Such a provincial conception of community need has never been recognized by our caselaw construing 79-201 *Ninth*. For purposes of this statutory exemption, community need must not be assessed solely based on services within the county where the property is located.

The word "community" is defined as a neighborhood or vicinity as well as a group or class of people having similar interests or society as a whole. See Black's Law Dictionary 317 (9th ed. 2009); Webster's II New Riverside University Dictionary 288 (1984). Judge, now Justice, Beier, writing for the Court of Appeals in *Mercy Health System of Kansas*, 29 Kan. App. 2d at 380, appeared to agree with this interpretation when indicating BOTA unduly emphasized this inquiry and used it as a proxy for the overall question of whether the requirements for a tax exemption were met. The threshold or primary requirement of K.S.A. 2010 Supp. 79-201 *Ninth* is whether the property is substantially and predominantly related to the purpose of providing humanitarian services. Here the evidence shows that BSA served the needs of the Boy

Scout community in its 30-county region, which included Chautauqua County. We deem this showing sufficient for purposes of K.S.A. 2010 Supp. 79-201 *Ninth*. See *Univ. of Kan. School of Medicine*, 266 Kan. at 757-58, 766; *Mercy Health System of Kansas*, 29 Kan. App. 2d at 380.

We hold that for purposes of determining compliance with the statutory definition of humanitarian services within K.S.A. 2010 Supp. 79-201 *Ninth*, community need must not be assessed solely based on services directed or delivered within the county where the property is located.

Considering the expansive definition of humanitarian services in K.S.A. 2010 Supp. 79-201 *Ninth*, we conclude BSA was organized for the predominant purpose of providing humanitarian services, and these services met a demonstrated community need. Having determined the ranch is "actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services," we must determine whether the nonexempt uses of the ranch are "minimal in scope and insubstantial in nature" and "incidental" to BSA's humanitarian purposes and uses under K.S.A. 2010 Supp. 79-201 *Ninth*(e).

## Did COTA Err in Concluding that Nonexempt Uses Were Not Minimal in Scope and Insubstantial in Nature?

COTA also determined that the nonexempt uses of grazing, hunting, and fishing were not minimal in scope and insubstantial in nature, as required for exemption under K.S.A. 2010 Supp. 79-201 *Ninth*, stating:

"The Court further finds that the lessees' use of the property is not minimal in scope and insubstantial in nature. While the applicant [BSA] would like the Court to focus only on the amount of income received by the leasing of the property, the Court finds that it must also examine the physical use of the property. The applicant has not provided any evidence to demonstrate that the grazing and hunting only occurs on a portion of the property. Therefore, the Court concludes that the nonexempt use is occurring on all portions of the property. [Cattle operator] is allowed to graze cattle for a 180-day period, while [guided hunting operator] is allowed to hunt on the property for turkey and deer-bow and deer-rifle seasons. [Cattle operator's] use of the property is for approximately one-half of the year, while [guided hunting operator's] use of the property is for approximately 70% of the year. When compared to the applicant's use of the property

for only six weeks and occasionally on weekends, [nonexempt operators] use of the property cannot be deemed to be minimal in scope or insubstantial in nature."

K.S.A. 2010 Supp. 79-201 *Ninth* subsection (e) provides the following guidelines for use of the property:

"(e) the actual use of property for which an exemption is claimed must be substantially and predominantly related to the purpose of providing humanitarian services, except that, the use of such property for a nonexempt purpose which is minimal in scope and insubstantial in nature shall not result in the loss of exemption if such use is incidental to the purpose of providing humanitarian services by the corporation."

BSA suggests that COTA improperly measured and compared exempt and nonexempt uses for purposes of K.S.A. 2010 Supp. 79-201 *Ninth* and should have used either a "use-day" analysis or a revenue comparison.

The record on appeal contains the BSA's use-day analysis for the period September 2007 thru August 2008. The executive director testified that one Scouting day equals a 24-hour period where an individual Boy Scout spends time on the ranch. His calculation indicated that, for this period, Scouting use-days were 14,165, whereas only 6 individuals hunted on the ranch for 5 days each, and from May 1, 2008, thru October 1, 2008, 45 cow/calf pairs were permitted to graze on the ranch. Although more grazing was permitted by the 2009 lease, we are persuaded that this use-day analysis illustrates that the nonexempt uses were minimal in scope and insubstantial in nature.

Even more persuasive, however, were BSA's revenue comparisons. BSA provided a comparison of both exempt and nonexempt ranch revenues and expenses for the years 2006-2008. Total Scouting revenue for the year 2006 was $257,571. Of that amount, $11,975 came from non-Scouting revenue or 4% of the total revenue. Total operating expenses in 2006 were $346,993.81, resulting in a loss of $75,447.81. In 2007, the ranch had total revenues of $186,796, of which $14,450 came from non-Scouting revenues or 7% of the total revenue. Total operating expenses were $275,370.98, resulting in a loss of $74,124.98. For 2008, total revenues were $222,626, of which $19,652.50 came from non-Scouting sources or 8% of total revenues. The operating expenses for

the ranch totaled $284,128, resulting in a loss of $41,849.50. In light of the annual deficit, BSA supported the ranch from other sources such as United Way, popcorn sales, and donations. According to BSA's exemption application, fees collected from cattle grazing and guided hunts were used to support camperships and scholarships for youth who could otherwise not participate in ranch activities.

Not only do we endorse a use-day analysis as preferable to COTA's analysis, we hold that a revenue comparison is supported by a host of appellate cases. A comparison of revenue from Scouting and non-Scouting activities is an appropriate measure of "minimal and insubstantial" under K.S.A. 2010 Supp. 79-201 *Ninth*(e). See *Univ. of Kan. School of Medicine*, 266 Kan. at 764-69 (leasing arrangements are not prohibited by 79-201 *Ninth* and below market rental did not inure to the benefit of any private shareholder or individual); *Mercy Health System of Kansas*, 29 Kan. App. 2d at 376, 380-81 (nonexempt uses accounted for less than 4% of the center's gross revenues); *Hutchinson's Historic Fox Theatre*, 2003 WL 22119343, at *3 (nonexempt rental use of the theatre provided only 8.8% of the theatre's total revenue in 1999 and less than 2% of revenue in 2000-2001).

BSA urged COTA to consider its revenue comparisons as well as intensity of use in its petition for reconsideration. With respect to revenue evidence, however, COTA noted the percentage of non-Scouting revenue compared to total revenue continued to increase yearly—from 5.52% in 2007 to 9.58% in 2009. As a result, COTA found the ranch was being used as an "investment tool" and the "dominant motive" in entering the lease arrangements· was "profit." We disagree. Lease arrangements are allowed under K.S.A. 2010 Supp. 79-201 *Ninth*. The legislature specifically omitted in K.S.A. 2010 Supp. 79-201 *Ninth* the language from K.S.A. 2010 Supp. 79-201 *Second* that prohibited income where such property is " 'held or used as an investment even though the income or rentals received therefore is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes.' " *Univ. of Kan. School of Medicine*, 266 Kan. at 768. Here, no part of the lease income inured to the benefit of the directors

or members of BSA, and the ranch realized no profit from this income—the ranch operated at a loss and relied on donations and financial assistance from other community service organizations. Moreover, all revenue from the nonexempt uses was utilized to fund scholarships to the ranch.

We also note that the nonexempt uses of the property were incidental to the purpose of providing humanitarian services by BSA. First, the totality of the revenue received from these purposes was directed entirely to the extension of the humanitarian services by funding scholarships to the ranch. Second, the nonexempt uses were incidental in the sense that they were consistent with the maintenance of a ranch; *i.e.*, proper grazing and wildlife management practices were considered by BSA to be critical to maintaining the property as a ranch. Indeed, the record on appeal contains substantiation for BSA's participation in the United States Department of Agriculture conservation program—the Environmental Quality Incentives Program (EQIP). BSA's executive director explained that EQIP involves management of grasslands through cattle grazing and thinning of wildlife through hunting. Such uses seem to this court to be precisely the type of incidental uses contemplated by the statutory scheme.

Although the interpretation of tax exemptions from other states is of limited value, see *Univ. of Kan. School of Medicine*, 266 Kan. at 760, a similar tax issue concerning a Boy Scout camp on substantial land was addressed in *In the Matter of Nassau County Council Boy Scouts of America*, 84 A.D.2d 862, 444 N.Y.S.2d 755 (1981). In that case, the Board of Assessors placed 3,700 acres of a 4,300-acre Boy Scout camp back on the tax rolls because (1) much of the land was used so infrequently that it was in a state of "nonuse," as opposed to used in furtherance of the Boy Scouts' exempt purposes, and (2) 2,300 of the 3,700 acres were "primarily used" for commercial lumbering and timber activity. Timber sale contracts produced annual income of approximately $10,000 in 1977 and $20,000 in 1978. The New York Supreme Court Appellate Division reversed, concluding the 3,700 acres were used primarily in furtherance of the exempt purpose for which the Boy Scouts are organized. The court found the whole of the camp, composed of

heavily wooded acres with miles of trails and old logging roads, was an integral part of the camp and served to preserve the character of the facility. Further, the court found the lumbering activities did not alter the primary use of the camp because the revenue derived from lumbering was used to defray the cost of operating the camp and did not interfere with use of the camp. Accordingly, the court found this activity was minimal and merely incidental to the exempt purpose. 84 A.D.2d at 863. We agree with this analysis.

In summary we conclude the predominant purpose and use of the ranch was for humanitarian services despite the fact that camps are held for only 6 weeks in the summer and weekends during the fall and spring. The cattle grazing, hunting, fishing, and conservation practices do not interfere with the predominant purpose of the ranch, and the revenue these activities generate are used to offset operational expenses and provide scholarships for youth. Accordingly, these nonexempt uses should be considered "minimal in scope and insubstantial in nature" and should not result in the loss of exemption because such uses are merely "incidental to the purpose of providing humanitarian services" under K.S.A. 2010 Supp. 79-201 *Ninth*(e).

For all the reasons noted above, we reverse the decision of COTA and remand with directions to restore the BSA's tax-exempt status for its Chautauqua County ranch.

Reversed and remanded with directions.